SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## State v. Hector Feliciano (a/k/a Hector Feleciano) (A-24-14) (074395)

**Argued December 2, 2015 -- Decided March 9, 2016**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers the constitutionality of the "roving wiretap" provision of the State's wiretap law, which allows the police, under certain circumstances, to intercept communications on a newly discovered telephone facility used by the target, without first returning to a judge, N.J.S.A. 2A:156A-9(g)(2).

In November 2007, the Camden County Prosecutor's Office and members of the Philadelphia/Camden High Intensity Drug Trafficking Area Task Force began to investigate a heroin trafficking network in Camden. During the investigation, law enforcement officials applied for ten wiretap orders. Eight of the orders included "roving" provisions, two of which were activated by the police. Afterward, law enforcement officials notified the wiretap judge about the switch to both new facilities. Over time, the police intercepted numerous calls between defendant and others about buying and selling narcotics, the quality of the drugs, and related issues. Ultimately, the Task Force arrested twenty-four individuals; the grand jury indicted defendant and ten others. The indictment charged defendant as a leader of a narcotics trafficking network, contrary to N.J.S.A. 2C:35-3. Defendant was also charged with two first-degree counts of possession with intent to distribute and distribution of heroin, cocaine, MDMA/ecstasy, and marijuana, and second-degree conspiracy to distribute those drugs.

Defendant moved to suppress the evidence obtained from the wiretaps. He argued that the orders failed to protect his constitutional rights because they were overly broad and allowed the police to intercept facilities that were not specified. The judge denied the motion, finding that each wiretap application fulfilled the requirements of N.J.S.A. 2A:156A-9 and was properly authorized. The judge also rejected defendant's claim that, by allowing 24/7 interception, the wiretap orders were too broad. The court found that the orders were justified by the unpredictable nature of the narcotics conspiracy and the minimization requirements imposed. Defendant also moved to dismiss the count of the indictment that alleged that he was a leader of a narcotics trafficking network. The trial court denied the motion concluding that the State presented "more than adequate" evidence to support a prima facie case. Defendant pleaded guilty to leading a narcotics trafficking network, and the State dismissed the remaining charges.

Defendant appealed, claiming the court erred when it denied his motions to suppress the wiretap evidence and dismiss a count of the indictment. He argued that the roving wiretap statute is unconstitutional because it does not satisfy the particularity requirement and that the wiretap orders improperly permitted 24/7 surveillance. He also claimed that the State failed to present sufficient evidence to the grand jury that he was a leader of a narcotics trafficking network. The Appellate Division rejected defendant's arguments and affirmed his conviction.

The Court granted defendant's petition for certification. 222 N.J. 311 (2015).

**HELD:** When a target purposely changes facilities to avoid detection, law enforcement officers may switch over and begin to monitor a new facility under the State's wiretap law, provided they have otherwise fully complied with the statute. Going forward, law enforcement must notify a wiretap judge within 48 hours of the switch and obtain authorization to continue monitoring the new facility.

1. The Fourth Amendment to the United States Constitution guards against unreasonable searches and seizures. It states that warrants must be supported by probable cause and must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The New Jersey Constitution contains nearly identical language. N.J. Const. art. I, ¶ 7. (pp. 16-18)

2. The Fourth Amendment governs electronic interception of phone conversations. In 1968, Title III of the Omnibus Crime and Safe Streets Act, 18 U.S.C.A. §§ 2510-2520, established standards for law enforcement officials to follow when seeking to intercept wire, oral, and electronic communications. Soon after, New Jersey enacted the Wiretapping and Electronic Surveillance Control Act ("Wiretap Act" or "Act"), N.J.S.A. 2A:156A-1 to -26, modeled after Title III. In 1986, Congress amended Title III and added the "roving wiretap" provision. From 1986 to 1998, Title III authorized roving wiretaps if "the application identifies the person believed to be committing the offense and whose communications are to be intercepted and the applicant makes a showing of a purpose, on the part of that person, to thwart interception by changing facilities," among other requirements. 18 U.S.C.A. § 2518(11)(b)(i)-(iii) (1986) (amended 1998) (emphasis added). New Jersey added a roving wiretap provision in 1993, which closely tracked then-existing federal law. Congress amended Title III in 1998, easing the requirements to obtain a roving wiretap, but the State Legislature did not follow suit. It maintained the original, stricter standard that requires the State to show the target has a "purpose . . . to thwart interception." New Jersey also did not add a proximity requirement. Thus, under the Act, an application for a roving wiretap must specify the original facility, but not the character and location of the phone the target jumps to. The application must identify the target whose communications are to be intercepted. And, under New Jersey law, the applicant must demonstrate the target's purpose to thwart interception by changing facilities. (pp. 18-24)

3. To assess defendant's claim that the Wiretap Act violates the particularity requirement, the Court gives careful consideration to federal decisions interpreting the federal statute because New Jersey's Wiretap Act is modeled after Title III. Four federal circuit courts have considered similar challenges, and each rejected the claim. Given that federal case law does not support defendant's position, the Court focuses on the heightened protections that Article I, Paragraph 7 of the State Constitution affords. (pp. 24-27)

4. The orders in this case, at the initial stage, do not present the concerns raised in State v. Marshall, 199 N.J. 602 (2009), a case on which defendant relies heavily. In Marshall, this Court concluded that a warrant failed to satisfy the particularity requirement because it included conditional language that allowed the police to determine which apartment to search after the warrant was issued, thereby "delegate[ing] to the police" the role of determining probable cause. Id. at 613. Here, by contrast, the wiretap judge initially found probable cause to monitor a particular facility, and that a particular target -- who was identified in the application -- had a purpose to thwart interception by changing facilities. Marshall's concerns, though, surface when a target moves beyond the original, listed phone. Under the Act, law enforcement officers have the sole authority to identify the new facility that a target has switched to, and to elect to intercept communications over it, without returning to the court. There are public safety concerns underlying that approach. Simply put, if officers could not continue to monitor the new phone, they would lose important evidence. That exigency can justify interception of a new facility without first returning to a judge. (pp. 27-30)

5. If a court receives timely information about a target's move to a new facility soon after the switch takes place, a neutral judge can authorize continued interception or halt a wiretap if necessary. To avoid serious questions under the State Constitution, the Court directs that certain procedures be followed going forward, including that the State must notify the wiretap judge within 48 hours after it begins interception of a new facility. (pp. 31-34)

6. Defendant also challenges the wiretap orders entered in this case because they permitted interception twenty-four hours a day, seven days a week. N.J.S.A. 2A:156A-12 provides that "[n]o order entered under this section shall authorize the interception of any wire, electronic or oral communication for a period of time in excess of that necessary under the circumstances." (emphasis added). The statute also requires that reasonable efforts be made to reduce the hours of interception, whenever possible. Here, the court's orders directed the Task Force to make reasonable efforts to reduce the hours of interception whenever possible, and, under the circumstances, there was no abuse of discretion in allowing 24/7 monitoring in the investigation. Recognizing that the nature of a large-scale narcotics distribution ring may involve unpredictable hours that can justify 24/7 interception in certain cases, the preferred practice is to specify more limited hours of interception in a wiretap order whenever possible. (pp. 34-38)

7. Finally, the Court rejects defendant's claim that the State did not present sufficient evidence before the grand jury to support the charge that he was a leader of a narcotics trafficking network, contrary to N.J.S.A. 2C:35-3. The trial judge carefully reviewed the grand jury record and found that the State presented ample evidence to support each element of the offense. (pp. 38-42)

The judgment of the Appellate Division is **AFFIRMED AS MODIFIED**.

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON, and JUDGE CUFF (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

HECTOR FELICIANO (a/k/a
HECTOR FELECIANO),

    Defendant-Appellant.


        Argued December 2, 2015 – Decided March 9, 2016

        On certification to the Superior Court,
        Appellate Division.

        Elizabeth C. Jarit, Assistant Deputy Public
        Defender, argued the cause for appellant
        (Joseph E. Krakora, Public Defender,
        attorney).

        Steven A. Yomtov, Deputy Attorney General,
        argued the cause for respondent (John J.
        Hoffman, Acting Attorney General of New
        Jersey, attorney).

        Alexander R. Shalom argued the cause for
        amicus curiae American Civil Liberties Union
        of New Jersey (Edward L. Barocas, Legal
        Director, attorney).


    CHIEF JUSTICE RABNER delivered the opinion of the Court.

    This case raises a novel question about the constitutionality of the roving wiretap provision of the State's wiretap law. As a general rule, law enforcement officials must follow a strict set of procedures and get court approval before

1

they may intercept communications over a telephone facility. Among other requirements, the State must identify in advance the specific facility it seeks to intercept.

If a suspect purposely switches telephone facilities to thwart detection, though, he can effectively avoid being intercepted. To address that situation, both federal and state law contain a "roving wiretap" provision that allows the police, under certain circumstances, to intercept communications on a newly discovered facility used by the target, without first returning to a judge. See 18 U.S.C.A. § 2518(11)(b); N.J.S.A. 2A:156A-9(g)(2). Under state law, a judge must have previously made a finding about the target's purpose to thwart interception by changing facilities. N.J.S.A. 2A:156A-9(g)(2)(b), (c). In practice, if a target then switches phones, law enforcement can begin monitoring the new phone under the existing warrant.

Defendant challenges the roving wiretap provision. He claims that because it does not require law enforcement to identify a telephone facility with particularity and get court approval in advance, the provision violates both the Fourth Amendment and Article I, Paragraph 7 of the State Constitution.

When a target purposely changes facilities to avoid detection, he creates an inherent exigency that important evidence will be lost. We therefore find that law enforcement officers may switch over and begin to monitor a new facility

under the State's wiretap law, provided they have otherwise fully complied with the statute.  However, to avoid serious questions under the State Constitution, we direct that, going forward, law enforcement must notify a wiretap judge within 48 hours of the switch and obtain authorization to continue monitoring the new facility.

We therefore modify and affirm the judgment of the Appellate Division, which declined to find the roving wiretap provision unconstitutional.  We also affirm the panel's judgment that (1) the trial court did not abuse its discretion by permitting interception at any time of the day, seven days a week, in light of the nature of the large-scale narcotics operation in this case, and (2) the State presented sufficient evidence to the grand jury to establish that defendant was the leader of a narcotics trafficking network.

I.

To recount the facts, we draw from the wiretap judge's detailed findings of fact as well as other materials in the record.

In November 2007, Investigator Jeffrey Dunlap of the Camden County Prosecutor's Office, along with members of the Philadelphia/Camden High Intensity Drug Trafficking Area Task Force, began to investigate a large-scale heroin trafficking network in Camden.  Months later, the Task Force arrested

3

twenty-four individuals, many of whom were charged with distributing large amounts of heroin, cocaine, MDMA/ecstasy, and marijuana. Law enforcement officials applied for ten wiretap orders during the course of the investigation, numbered, for ease of reference, as "5WT," "6WT," and "8WT" through "15WT." Defendant Hector Feliciano was the target of five wiretaps; co-defendants Jessie Morales and Santos Cuevas were the targets of the other applications.

Eight of the ten wiretap orders included "roving" provisions. Only two of the eight provisions, 10WT and 12WT, were activated by the police. Afterward, law enforcement officials notified the wiretap judge about the switch to both new facilities.

The investigation initially focused on Morales. Undercover officers made two controlled buys of heroin from Morales, who offered to supply as much heroin as needed. The Task Force then applied for a pen register[1] for Morales' cell phone, ending in 6148, and another phone, ending in 2421. Not long after, Morales told a confidential informant to contact him on a third

---

[1] A pen register is a device that identifies all local and long distance numbers dialed, even if a call is not completed. See United States v. Giordano, 416 U.S. 505, 549 n.1, 94 S. Ct. 1820, 1842, 40 L. Ed. 2d 341, 372 (1974) (Powell, J., dissenting).

4

cell phone -- one of a number of times that Morales and his co-defendants switched to a different phone number.

On February 11, 2008, the Task Force applied for a wiretap of the 6148 and 2421 numbers. The wiretap judge approved the requests and entered two orders, 5WT and 6WT. As to each, the judge found probable cause to believe that (1) "Morales has been and is engaging with as yet unidentified others in a continuing criminal enterprise to distribute" narcotics; (2) "[c]ommunications evidentiary of such offenses will be obtained through the interception applied for"; and (3) the identified cell phone "is, has been, and is about to be used in the commission of the aforesaid offenses, and is being utilized by" Morales.

In each order, the judge also found probable cause to believe that "Morales has previously acted to change communications facilities for the purpose of thwarting law enforcement. This purpose has been adequately shown. Moreover, it has adequately been shown that it is likely he will continue to do so." As a result, the orders authorized law enforcement to intercept communications from the 6148 and 2421 numbers "or any subsequent phone determined during the course of this investigation to be utilized by . . . Morales as a replacement for [the respective numbers] in the event said phone is inactivated, relating to the crimes of Possession with the

5

Intent to Distribute Controlled Dangerous Substances and Conspiracy."

The wiretap judge authorized interception twenty-four hours a day, seven days a week, for a twenty-day period, in 5WT and 6WT. He also directed that "[i]nterception shall terminate as soon as practicable and be conducted in such a manner to minimize or eliminate the interception of communications . . . by making reasonable efforts, whenever possible, to reduce the hours of interception." In addition, the order directed monitors to minimize the interception of non-relevant conversations.

On February 19, 2008, the police sought to amend 6WT when activity on the 2421 number "abruptly ceased." The police confirmed that Morales had "abandoned" the number and begun using a new one, 1041. The wiretap judge amended the order to cover the new phone. Based on conversations intercepted on this phone, the wiretap judge found that co-defendant Cuevas was involved with Morales in trafficking narcotics.

The police then applied for and received authorization to wiretap two cell phones that belonged to Cuevas, 8WT and 9WT. The police intercepted 246 calls to defendant on 8WT, 28 of which "directly related to the sale of narcotics." In those conversations, defendant agreed to supply Cuevas with heroin on

6

a number of occasions.  The police also identified two cell phone numbers that defendant used when he spoke with Cuevas.

On March 19, 2008, Morales and Cuevas spotted an undercover police officer while they were distributing drugs.  Days later, in a conversation with defendant, Cuevas urged him to "put some minutes on that phone" -- a reference to another unidentified number.  The wiretap judge concluded that, "out of fear of police," Cuevas wanted to use a new phone.

On March 28, 2008, the wiretap judge signed two new orders, 10WT and 11WT, for defendant's cell phones.  The orders contained findings similar to those recounted above.  The wiretap judge found that defendant had changed phones with a purpose to thwart law enforcement and therefore allowed interception of calls from any other cell phone defendant used.

On April 2, 2008, the officers determined that defendant had stopped using the phone covered by 10WT.  They terminated the wiretap on that phone and, pursuant to the roving wiretap provision, started monitoring a new phone that defendant had begun using, which ended in 7585.  Law enforcement officers notified the wiretap judge of the switch.  In a memo dated April 4, 2008, which was supplied to the judge, Investigator Dunlap noted that defendant provided the new number, 7585, to an unidentified woman during an intercepted call on April 2, 2008.  Officials began monitoring the new number that day.  They

7

continued to do so for twenty-five days until the original order for 10WT expired.

On April 3, 2008, the Task Force applied for a roving wiretap for a cell phone that Cuevas used, ending in 2228. The wiretap judge entered order 12WT to authorize interception. After eighteen days, officers concluded that Cuevas stopped using the phone and terminated the wiretap. In a memo dated April 21, 2008, Investigator Dunlap noted that on that day, Cuevas provided defendant with another number, ending in 4074, which the officers began to monitor the same day, pursuant to 12WT's roving wiretap provision. The memo was also provided to the judge. Police monitored number 4074 for twelve days, until the original order for 12WT lapsed. The record does not appear to refer to pertinent conversations from this number.

During a series of intercepted calls in late March and early April 2008, including some on the 7585 phone, defendant called an individual in New York, who the officers believed was defendant's heroin supplier. Other calls revealed that defendant planned to travel to New York to get more heroin.

On April 8, 2008, defendant spoke with co-defendant Faylene Carmichael and told her to rent a car. He added that they should take the baby to make it look like a family trip. Soon after, according to a wiretap application, the police observed Carmichael arrive at defendant's home in a rental car. Within

8

an hour, they left with a small child.  Investigator Dunlap testified before the grand jury that defendant spoke with his New York supplier the same morning and discussed meeting later in the day.  Officers observed defendant arrive at an apartment building in New York City early in the afternoon; defendant got out of the rental car with an envelope and returned ten minutes later.

On April 10, 2008, the Task Force intercepted a call between defendant and a person later identified as William Kearny.  The two discussed a "DEA" (Drug Enforcement Administration) action against "Pooh."  In the same conversation, police believed that defendant told Kearny to recruit Pooh's "main" customers.

Two days later, defendant called his brother, who police believed asked for 100 ecstasy pills from a shipment of 1000 pills that defendant had recently received.

Based on those and other intercepts, on April 28, 2008, the wiretap judge granted an application to monitor three telephone facilities that defendant used.  The orders for 13WT, 14WT, and 15WT contained the same types of findings recounted above.

On May 1, 2008, officers intercepted a call defendant placed to Ricardo Cordero.  Police believed that defendant was on vacation in Florida at the time, and that Cordero was resupplying defendant's associates when they needed drugs.

During the conversation, Cordero told defendant that "they can meet me at" a particular grocery store.

For the rest of the month, the police intercepted numerous calls between defendant and others about buying and selling narcotics, the quality of the drugs, and related issues. The Task Force applied for and received extensions for the orders for 13WT and 14WT on May 27, 2008.

The Task Force also applied for two dozen arrest warrants and six search warrants on June 20, 2008. The wiretap judge authorized all of them, including arrest warrants for defendant, Morales, and Cuevas, and a search warrant for a Dodge Avenger, another rental car. Law enforcement had surveilled defendant, Carmichael, and a child traveling to New York City in the car on June 20, 2008. After they observed a hand-to-hand exchange between defendant and an individual the officers believed was defendant's New York supplier, they followed the car while it traveled back to New Jersey. When the officers executed the warrant, they found about 200 grams of heroin and $600 in cash on defendant. They also seized three cell phones.

Defendant made a statement to the police after his arrest. He admitted that he had paid his supplier $11,000 for the 200 grams of heroin he possessed. Defendant added that he had received 1500 to 1800 grams of heroin from the supplier during a

10

four-to-five-month period, and that he had packaged the heroin and supplied it to several drug sets in Camden.

Investigator Dunlap testified at length before a Camden County grand jury on June 4, 2009.  He recounted various details about the long-term investigation, some of which are summarized above.  The grand jury returned an indictment the following week against defendant and ten others.  Count seven of the indictment charged defendant as a leader of a narcotics trafficking network, a first-degree offense contrary to N.J.S.A. 2C:35-3.  Defendant was also charged with two first-degree counts of possession with intent to distribute and distribution of heroin, cocaine, MDMA/ecstasy, and marijuana, and second-degree conspiracy to distribute those drugs.

Defendant moved to suppress the evidence obtained from the wiretaps.  He argued that the orders failed to protect his constitutional rights because they were overly broad and allowed the police to intercept facilities that were not specified in the orders.  The same judge who oversaw the wiretap heard and denied the motion.  After the court reviewed the investigation in detail and made extensive findings, the judge found that each wiretap application fulfilled the requirements of N.J.S.A. 2A:156A-9 and was properly authorized.  The judge also rejected defendant's claim that, by allowing 24/7 interception, the wiretap orders were too broad.  The court found that the orders

11

were justified by the unpredictable nature of defendant's narcotics conspiracy and the minimization requirements imposed.

Defendant also moved to dismiss count seven of the indictment, which alleged that he was a leader of a narcotics trafficking network. The trial court outlined the elements of the offense and reviewed with care the evidence presented to the grand jury in support of each element. The court concluded that the State presented "more than adequate" evidence to support a prima facie case and denied the motion.

On October 28, 2011, defendant pleaded guilty to count seven and admitted that he was a leader of a narcotics trafficking network, in violation of N.J.S.A. 2C:35-3. The State, in turn, dismissed the remaining charges. Defendant expressly reserved the right to appeal the motions described above. Consistent with the plea agreement, the court sentenced defendant on January 13, 2012 to thirty years' imprisonment with fifteen years of parole ineligibility. Among other fines and penalties, the court imposed a $200,000 anti-profiteering fine and ordered defendant to forfeit $12,609 in cash seized from him.

Defendant appealed. He claimed the trial court erred when it denied his motions to suppress the wiretap evidence and dismiss count seven. He argued that the roving wiretap statute is unconstitutional because it does not satisfy the

12

particularity requirement and that the wiretap orders improperly permitted 24/7 surveillance. He also claimed that the State failed to present sufficient evidence to the grand jury on count seven.

The Appellate Division rejected defendant's arguments and affirmed his conviction. Because the State's wiretap statute is modeled after federal law, the panel looked to federal case law for guidance. The panel observed that "federal circuit courts have consistently upheld roving wiretaps" against constitutional challenges, and found no basis for heightened protection under the State Constitution.

The Appellate Division also found that the wiretap judge did not abuse his discretion by permitting 24/7 interception in light of settled case law and the nature of the conspiracy. Finally, the panel concluded that the State presented "ample evidence" to the grand jury to establish that defendant was the leader of a narcotics trafficking network.

Defendant raised the same three issues in his petition for certification, which the Court granted. 222 N.J. 311 (2015).

II.

Defendant argues that the roving wiretap provision of the State's wiretap act, N.J.S.A. 2A:156A-9(g)(2), violates the particularity requirement of the State and Federal Constitutions -- namely, the mandate that warrants "particularly describ[e]

13

the place to be searched." U.S. Const. amend. IV; N.J. Const. art. 1, ¶ 7. Defendant claims that because wiretap orders issued under the statute do not identify the new telephone facility to be monitored, the orders impermissibly delegate to law enforcement the task of finding probable cause to tap a phone. The statute, defendant argues, therefore eliminates judicial oversight that the State Constitution requires. Although federal cases have upheld the constitutionality of the analogous federal provision, defendant contends that the State's roving wiretap provision runs afoul of the State Constitution, which offers greater privacy protection to New Jersey residents.

Alternatively, defendant suggests that the wiretap statute could be read to include an exception for exigent circumstances. In the case of true exigency, defendant contends, the police could continue the sanctioned wiretap on a new phone "only until they are able to amend the wiretap order with the new number."

Defendant also argues that the wiretap orders impermissibly authorized 24/7 surveillance. He claims that the wiretap applications identified a narrower timeframe when calls were likely to occur; the orders, as a result, were for a period "in excess of that necessary under the circumstances," contrary to N.J.S.A. 2A:156A-12.

Finally, defendant claims that the State did not present sufficient evidence to the grand jury to support each element of

14

the charge that he was a leader of a narcotics trafficking network.

The Court granted the motion of the American Civil Liberties Union of New Jersey (ACLU) to appear as amicus curiae. The ACLU also argues that roving wiretaps do not satisfy the particularity requirement of the State Constitution because they fail to describe particularly the evidence to be searched. The ACLU submits that the roving wiretap statute vests too much discretion in law enforcement officers and allows them, instead of a judge, to decide which telephone facility to search. The ACLU asserts that, rather than find that the law meets the particularity requirement, the Court could treat roving wiretaps as an exception to the warrant requirement subject to certain safeguards.

The Attorney General, on behalf of the State, emphasizes that every federal court that has addressed defendant's particularity claim has rejected it. The State submits that because this Court typically follows federal law when it considers wiretap challenges to comparable state law, the Court should do the same here. The Attorney General stresses that roving wiretaps merely allow the police to intercept temporarily a newly discovered phone, used by an identified target, after a judge has found probable cause to believe the target changes phones to thwart interception. The State adds that the police

15

did not exercise unbridled discretion in this case; they instead notified the wiretap judge when they used the roving wiretap provision.

The Attorney General also argues that 24/7 monitoring was appropriate in light of the unpredictable pattern of calls in this large-scale narcotics operation as well as law enforcement's efforts to reduce the hours of interception. In addition, the Attorney General highlights the evidence before the grand jury, which the State claims sufficiently supported each element of the charge that defendant led a narcotics trafficking network.

## II.

We begin with defendant's challenge to the constitutionality of the roving wiretap provision. Defendant argues that the provision violates the particularity requirement of the Federal and State Constitutions.

## A.

The Fourth Amendment to the United States Constitution guards against unreasonable searches and seizures. U.S. Const. amend. IV. It states that warrants must be supported by probable cause and must "particularly describ[e] the place to be searched, and the persons or things to be seized." Ibid. Article I, Paragraph 7 of the New Jersey Constitution contains nearly identical language. N.J. Const. art. I, ¶ 7.

16

To satisfy that mandate, officers typically gather evidence to establish probable cause, but only a "neutral and detached magistrate" may authorize a warrant.  See United States v. U.S. Dist. Court, 407 U.S. 297, 316, 92 S. Ct. 2125, 2136, 32 L. Ed. 2d 752, 766 (1972); State v. Brown, 216 N.J. 508, 539 (2014).

The particularity requirement, in general, mandates that a warrant sufficiently describe the place to be searched so "that the officer with a search warrant can with reasonable effort ascertain and identify the place intended."  State v. Marshall, 199 N.J. 602, 611 (2009) (quoting Steele v. United States, 267 U.S. 498, 503, 45 S. Ct. 414, 416, 69 L. Ed. 757, 760 (1925)). The purpose of the requirement "was to prevent general searches."  Maryland v. Garrison, 480 U.S. 79, 84, 107 S. Ct. 1013, 1016, 94 L. Ed. 2d 72, 80 (1987).  As the Supreme Court has explained,

> [v]ivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists.  The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws.
>
> [Stanford v. Texas, 379 U.S. 476, 481, 85 S. Ct. 506, 510, 13 L. Ed. 2d 431, 435 (1965).]

The Framers added the particularity requirement to the Bill of Rights to prevent such "wide-ranging exploratory searches."

Garrison, supra, 480 U.S. at 84, 107 S. Ct. at 1016, 94 L. Ed. 2d at 80; see also State v. Muldowney, 60 N.J. 594, 600 (1972).

Marshall illustrates the force of the particularity requirement. In that case, the police had gathered evidence against a suspect, which included a series of controlled buys of narcotics. Marshall, supra, 199 N.J. at 607. During the investigation, the police observed the suspect enter a building with two separate apartments. Id. at 606-07. The police applied for and obtained a warrant with conditional language that allowed them to search only if (1) the police secured the suspect outside the building and (2) a search of the suspect revealed documents or keys that identified the specific apartment to which the suspect had "possession, custody, control, or access," or the suspect himself revealed that information to the police. Id. at 608.

This Court concluded that the warrant was deficient because it allowed the police to determine which apartment to search after the warrant was issued. Id. at 613. "[T]he role of the neutral and detached magistrate" to determine probable cause "was delegated to the police." Ibid.

B.

The Fourth Amendment governs not only physical searches but also electronic interception of phone conversations. See Katz v. United States, 389 U.S. 347, 352-53, 88 S. Ct. 507, 512, 19

18

L. Ed. 2d 576, 582-83 (1967); Berger v. New York, 388 U.S. 41, 58-59, 87 S. Ct. 1873, 1883, 18 L. Ed. 2d 1040, 1052 (1967). The seminal opinions in Katz and Berger outlined certain principles to protect individual privacy rights in the area of electronic surveillance.

Congress responded to the decisions in 1968 when it enacted Title III of the Omnibus Crime and Safe Streets Act, 18 U.S.C.A. §§ 2510-2520. The new law "established minimum standards for federal and state law enforcement officials to follow when seeking to intercept wire, oral, and electronic communications." State v. Ates, 217 N.J. 253, 266, cert. denied, ___ U.S. ___, 135 S. Ct. 377, 190 L. Ed. 2d 254 (2014). Soon after, also in 1968, New Jersey enacted the Wiretapping and Electronic Surveillance Control Act ("Wiretap Act" or "Act"), N.J.S.A. 2A:156A-1 to -26, modeled after Title III. See Ates, supra, 217 N.J. at 266 (citations omitted).

Under the Wiretap Act, judges can authorize a wiretap if, among other things, they find probable cause to believe that:

> a. The person whose communication is to be intercepted is engaging or was engaged over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an [enumerated] offense . . .;
>
> b. Particular communications concerning such offense may be obtained through such interception;

19

c. Normal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; [and]

d. Except in the case of an application meeting the requirements of [N.J.S.A. 2A:156A-9, the roving wiretap provision], the facilities from which, or the place where, the wire, electronic or oral communications are to be intercepted, are or have been used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by, such individual.

[N.J.S.A. 2A:156A-10(a) – (d).]

The statute also contains strict minimization requirements. N.J.S.A. 2A:156A-12 provides that

[n]o order entered under this section shall authorize the interception of any wire, electronic or oral communication for a period of time in excess of that necessary under the circumstances. Every order entered under this section shall require that such interception begin and terminate as soon as practicable and be conducted in such a manner as to minimize or eliminate the interception of such communications not otherwise subject to interception under this act by making reasonable efforts, whenever possible, to reduce the hours of interception authorized by said order.

In 1986, Congress amended Title III and added what has become known as the "roving wiretap" provision -- codified at 18 U.S.C.A. § 2518(11). Pub. L. No. 99-508, Title I, § 106, 100 Stat. 1848, 1856-57 (1986). Subsection (a) applies to the

20

interception of oral communications; subsection (b) governs wire or electronic communications, which are involved in this appeal.

From 1986 to 1998, subsection (b) authorized the issuance of a roving wiretap if (1) a high-level official approved the application; (2) "the application identifies the person believed to be committing the offense and whose communications are to be intercepted and the applicant makes a showing of a <u>purpose, on the part of that person, to thwart interception</u> by changing facilities"; and (3) "the judge finds that such purpose has been adequately shown."  18 <u>U.S.C.A.</u> § 2518(11)(b)(i)-(iii) (1986) (amended 1998) (emphasis added).  In those cases, it is not necessary for the application to include "a particular description of the nature and location" of the facility to be intercepted, 18 <u>U.S.C.A.</u> § 2518(1)(b)(ii), or to establish probable cause that the facilities to be intercepted are being used in connection with the commission of the specified offense, or are leased to, listed in the name of, or commonly used by the target, 18 <u>U.S.C.A.</u> § 2518(3)(d).

Congress amended subsection (b)(ii) in 1998.  <u>Pub. L. No.</u> 105-272, Title VI, § 604, 112 <u>Stat.</u> 2396, 2413 (1998).  The current law, as revised, requires applicants for a roving wiretap to "make[] a showing that there is <u>probable cause to believe that the person's actions could have the effect of thwarting interception</u> from a specified facility."  18 <u>U.S.C.A.</u>

21

§ 2518(11)(b)(ii) (emphasis added).  The change in the highlighted language eased the requirements to obtain a roving wiretap.  See William C. Banks and M.E. Bowman, Executive Authority for National Security Surveillance, 50 Am. U. L. Rev. 1, 111 (October 2000).  Congress also added a section that limits "interception only for such time as it is reasonable to presume that the person identified . . . is or was reasonably proximate" to the facility to be intercepted.  18 U.S.C.A. § 2518(11)(b)(iv).

New Jersey added a roving wiretap provision in 1993.  L. 1993, c. 29, § 8.  It closely tracked then-existing federal law, and reads as follows:

> g.    An application need not meet the requirements of [N.J.S.A. 2A:156A-9(c)(4)] if:
>
> . . . .
>
> (2)  with respect to the application for an interception of a wire or electronic communication:
>
> (a)  the application is approved by the Attorney General or county prosecutor or a person designated to act for such an official and to perform his duties in and during his actual absence or disability; and
>
> (b)    the application identifies the person believed to be committing the offense and whose communications are to be intercepted and the applicant makes a showing of a purpose, on the part of that

22

> > person, to thwart interception by changing facilities; and
>
> > (c) the judge finds that such purpose has been adequately shown.
>
> [N.J.S.A. 2A:156A-9(g) (emphasis added).]

Like under federal law, the carve-out in the first sentence means that the State need not establish "the character and location of the particular wire or electronic communication facilities involved" in the case of a roving wiretap. See N.J.S.A. 2A:156A-9(c).

When Congress revised the federal standard in 1998, the State Legislature did not follow suit. It maintained the original, stricter standard that requires the State to show the target has a "purpose . . . to thwart interception." Compare N.J.S.A. 2A:156A-9(g)(2)(b) with 18 U.S.C.A. § 2518(11)(b)(ii). New Jersey also did not add a proximity requirement.

Thus, an application for a roving wiretap under the Act must specify the original facility, but not the character and location of the phone the target jumps to. The application must identify the target whose communications are to be intercepted.[2] And, under New Jersey law, the applicant must adequately

---

[2] For a traditional, non-roving wiretap, the order need only identify the target, "if known." 18 U.S.C.A. § 2518(4)(a) (emphasis added); N.J.S.A. 2A:156-12(b); see also United States v. Petti, 973 F.2d 1441, 1445 & n.3 (9th Cir. 1992), cert. denied, 507 U.S. 1035, 113 S. Ct. 1859, 123 L. Ed. 2d 480 (1993).

23

demonstrate the target's purpose to thwart interception by changing facilities.

As we noted in Ates, supra, "[t]he Wiretap Act must be strictly construed to safeguard an individual's right to privacy." 217 N.J. at 268 (citations omitted). "As with any statute, though, we presume the law is constitutional." Ibid. Defendant has the burden to overcome that presumption. Ibid.

## C.

To assess defendant's claim that the Wiretap Act violates the particularity requirement, we give "careful consideration to federal decisions interpreting the federal statute" because New Jersey's Wiretap Act is modeled after Title III. Id. at 269.

Four federal circuit courts have considered similar challenges. Each rejected the claim. The Ninth Circuit was the first to address the federal roving wiretap provision in Petti, supra. At the outset, the court outlined the test to determine "the sufficiency of the warrant description": "whether the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." Petti, supra, 973 F.2d at 1444 (quoting United States v. Turner, 770 F.2d 1508, 1510 (9th Cir. 1985), cert. denied, 475 U.S. 1026, 106 S. Ct. 1224, 89 L. Ed. 2d 334

24

(1986)). "To satisfy the particularity requirement," the panel continued, "the description of the place to be searched must not be so broad as to allow the search of places for which probable cause to search has not been demonstrated, or so vague that an executing officer might mistakenly search a place for which authorization was not granted." Ibid.

That court observed that if the description "avoids these dangers, it may comply with the particularity requirement even though it does not specify the physical location of the place to be surveilled." Ibid. In the context of roving wiretaps, the Ninth Circuit held as follows:

> The conditions imposed on "roving" wiretap surveillance by 18 U.S.C. § 2518(11)(b)(ii) satisfy the purposes of the particularity requirement. The statute does not permit a "wide-ranging exploratory search" and there is virtually no possibility of abuse or mistake: Only telephone facilities actually used by an identified speaker may be subjected to surveillance, and the government must use standard minimization procedures to ensure that only conversations relating to a crime in which the speaker is a suspected participant are intercepted. See 18 U.S.C. § 2518(5). Further, the statute excuses failure to identify the particular telephone facilities to be surveilled only if the government establishes to the court's satisfaction that it is impossible to specify the facilities because it is the suspect's purpose to thwart interception by changing them. See 18 U.S.C. § 2518(11)(b)(ii).
>
> [Petti, supra, 973 F.2d at 1445 (interpreting 1986 version of 18 U.S.C.A. § 2518(11)).]

25

The panel therefore concluded that the roving wiretap statute satisfied the particularity requirement and was constitutional. Ibid.  For similar reasons, the Second, Fifth, and Seventh Circuits agreed with Petti.  See United States v. Jackson, 207 F.3d 910, 914 (7th Cir.), vacated on other grounds, Jackson v. United States, 531 U.S. 953, 121 S. Ct. 376, 148 L. Ed. 2d 290 (2000); United States v. Gaytan, 74 F.3d 545, 553 (5th Cir. 1996); United States v. Bianco, 998 F.2d 1112, 1123-24 (2d Cir. 1993) (interpreting analogous "roving bug" provision under 18 U.S.C.A. § 2518(11)(a)), cert. denied, 511 U.S. 1069, 114 S. Ct. 1644, 128 L. Ed. 2d 364 (1994); see also United States v. Silberman, 732 F. Supp. 1057, 1062-63 (S.D. Cal. 1990), aff'd in part, vacated in part sub nom. Petti, supra, 973 F.2d 1441 (9th Cir. 1992).[3]

Defendant suggests that the above analysis conflicts with the United States Supreme Court's recent decision in Riley v. California, 573 U.S. ___, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014).  Riley, however, dealt with a different question: whether the police could conduct a warrantless search of data in

_____

[3]  Certain commentators have also concluded that the federal roving wiretap provision is constitutional.  See Michael Goldsmith, Eavesdropping Reform: The Legality of Roving Surveillance, 1987 U. Ill. L. Rev. 401, 403 (1987); Clifford S. Fishman, Interception of Communications in Exigent Circumstances: The Fourth Amendment, Federal Legislation, and the United States Department of Justice, 22 Ga. L. Rev. 1, 68-69 (1987).

26

a cell phone under the search-incident-to-arrest exception to the warrant requirement. <u>Id.</u> at ___, 134 <u>S. Ct.</u> at 2484-85, 189 <u>L. Ed.</u> 2d at 441-42. <u>Riley</u> did not refine or even address the particularity requirement.

Although defendant challenges the constitutionality of the State roving wiretap provision under both the Federal and State Constitutions, he focuses primarily on the heightened protections that Article I, Paragraph 7 of the State Constitution affords. <u>See</u> <u>State v. Earls</u>, 214 <u>N.J.</u> 564, 584 (2013). We do the same, given that federal case law does not support defendant's position.

D.

Defendant relies heavily on <u>Marshall</u>. In that case, the search warrant did not establish probable cause to search a particular apartment. <u>Marshall</u>, <u>supra</u>, 199 <u>N.J.</u> at 608, 613. Instead, the warrant delegated to the police the task of selecting the precise apartment to be searched. <u>Id.</u> at 613.

The orders in this case, at the initial stage, do not present the concerns raised in <u>Marshall</u>. Here, on the two occasions that the roving wiretap provision was used, the wiretap judge initially found probable cause to monitor a particular facility. The judge also found that a particular target -- who was identified in the application -- had a purpose to thwart interception by changing facilities.

27

Marshall's concerns, though, surface when a target moves beyond the original, listed phone.  Defendant raises serious questions under the State Constitution about the delegation of authority to law enforcement once that happens.  Under the Wiretap Act, law enforcement officers have the sole authority to identify the new facility that a target has switched to, and to elect to intercept communications over it, without returning to the court.

We recognize the public safety concerns underlying that approach.  See S. Rep. No. 99-541, at 5, 31 (1986) (stating that roving wiretap provision and other statutory changes "will be particularly helpful to the Justice Department in its fight against drug trafficking," and noting that "[t]he Committee finds such a [roving wiretap] provision necessary to cover circumstances under which law enforcement officials may not know, until shortly before the communication, which telephone line will be used by the person under surveillance"); Press Release, Office of the Governor, Governor Florio Signs Law Targeting High-Tech Criminals (Jan. 28, 1993) (noting that because police must specify "the phone to be tapped[,] [d]rug dealers and organized crime figures are aware that they can avoid detection by placing calls from randomly-selected public phones").  If a target changes facilities to thwart interception, important evidence may well be lost if the State

28

must begin the approval process anew each time. The reason for that is simple: it takes time for the State to draft and review a wiretap application that will be scrutinized with care and possibly challenged afterward, to obtain approval from the Attorney General, county prosecutor, or an appropriate designee, N.J.S.A. 2A:156A-9(g)(2)(a), and to present the application for review and approval by a judge. Advances in technology have made the process easier, but they cannot eliminate those steps. As a result, because of practical concerns, a target could evade detection altogether by switching facilities frequently enough.

By the time law enforcement is prepared to begin to monitor a target's new phone under the roving wiretap provision, a number of things have already taken place: a judge has made a probable cause finding about the target's involvement in specified criminal activity and has found that communications about the offense may be gathered through interception; a judge has additionally made a finding of a purpose, on the part of the target, to thwart interception by changing facilities; the target has in fact stopped using the originally designated phone; and the target has moved on to a replacement phone.

In that situation, the seriousness of the offense has already been established, the degree of urgency is plain, the amount of time needed to get a warrant is not insubstantial, and there is a reasonable belief that evidence is about to be lost.

29

See State v. DeLuca, 168 N.J. 626, 632-33 (2001). Therefore, a target's purposeful choice to switch facilities in order to thwart interception, under those circumstances, presents an inherent exigency that critical evidence tied to a serious offense will be lost because of the target's pointed, deliberate behavior. See Riley, supra, 573 U.S. at ___, 134 S. Ct. at 2487, 189 L. Ed. 2d at 445; Kentucky v. King, 563 U.S. 452, 460, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865, 874-75 (2011); DeLuca, supra, 168 N.J. at 632-33. Simply put, if law enforcement officers could not continue to monitor the new phone under that scenario, they would lose important evidence. That exigency can justify continued interception of a new facility without first returning to a judge. In other words, there is a basis for the officer, acting alone, to identify the new target facility and start to intercept communications without additional court involvement.

Defendant and amicus also address the next steps in the process. In this case, for example, investigators had court approval to intercept calls on a particular cell phone ending in 5769, under 10WT. They started to monitor conversations on March 28, 2008. Days later, the target switched phones and, consistent with the order, investigators began to intercept calls on the new number ending in 7585. They did so for twenty-five days, from April 2 to April 27, 2008.

Defendant and amicus contend that an extended period of interception of a new facility -- without separate court approval or judicial oversight -- cannot survive scrutiny under the State Constitution.  The State represents that it notified the wiretap judge after it switched to monitor new telephone facilities under both 10WT and 12WT.  The record contains copies of two memos by Investigator Dunlap, provided to the judge, which explain the basis for the changes.

We commend the practice the State used.  If a court receives timely information about a target's move to a new facility soon after the switch takes place, a neutral judge can authorize continued interception or halt a wiretap if necessary.  The Wiretap Act has a provision to facilitate the informal practice the State used here.  Under section 12(h),

> [w]henever an order authorizing an interception is entered, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception.  Such reports shall be made at such intervals as the court may require.
>
> [N.J.S.A. 2A:156A-12(h).]

In appropriate cases, the Court has the power to construe a statute "to free it from constitutional doubt."  In re Directive of the N.J. Dep't of Envtl. Prot., 110 N.J. 69, 82-83 (1988) (quoting N.J. State Chamber of Commerce v. N.J. Election Law

31

Enf't Comm'n, 82 N.J. 57, 75 (1980)); see also Town Tobacconist v. Kimmelman, 94 N.J. 85, 104 (1983). To avoid the serious State constitutional question that defendant and amicus raise -- about continued interception of a newly identified phone, without court involvement, under the roving wiretap provision -- we direct as follows:

Future orders for roving wiretaps should direct the State to notify the wiretap judge within 48 hours after the State begins interception of a new facility. In a report to the wiretap judge, the State should identify the new facility, relay when interception began, and explain the basis for switching to the new facility. If sufficient details are presented to supplement the original application, the wiretap judge will be in a position to decide whether interception should continue. In other words, the judge can determine if there is probable cause to believe that (1) the target identified in the original application has used or will be using the new facility, and (2) communications about the offenses identified in the original application may be obtained on the new facility.

We direct that reports be submitted within 48 hours of the start of interception of the new facility based on a comparable situation addressed in the Wiretap Act. Under N.J.S.A. 2A:156A-13, the State may informally apply for authorization to begin monitoring a telephone, without a court order, in the case of an

emergency that involves (1) "the investigation of conspiratorial activities of organized crime" or (2) "immediate danger of death or serious bodily injury to any person."  Within 48 hours of getting verbal approval, the State must apply for a formal order.  Ibid.

In the case of a roving wiretap, if it is not practical for the State to submit the report described above within 48 hours, the report should be submitted as soon as possible, with an adequate justification for the delay.

In light of the tight timeframe, we do not envision an elaborate process.  The State can submit the required information in a letter to the Court under section 12(h), with a place at the end of the document for the court to enter its findings.  If the judge is persuaded that a sufficient showing has been made, the court can find that there is probable cause for the two elements outlined above -- that the target identified in the original application has used or will be using the new facility, and that communications about the offenses identified in the original application may be obtained on the new facility -- and the court can authorize continued interception.  If the judge does not find a sufficient basis to continue the interception, the court will order that interception must cease.

We believe that the procedure set forth above eliminates doubts defendant has raised about the roving wiretap provision under the State Constitution. The approach also preserves the intended scope of the statute the Legislature enacted. See In re Directive of the N.J. Dep't of Envtl. Prot., supra, 110 N.J. at 83; N.J. State Chamber of Commerce, supra, 82 N.J. at 76.

As applied to this case, the information supplied to the wiretap judge provided a basis for the first finding, that defendant has used or will be using the new facility. The notice to the judge, coupled with other evidence in the extensive record, provided a basis for the second finding as well. We do not fault the experienced, specially designated wiretap judge who oversaw this investigation for not anticipating today's ruling and expressly making those findings.

IV.

Defendant also challenges the wiretap orders entered in this case because they permitted interception twenty-four hours a day, seven days a week. Section 12 of the Act provides that "[n]o order entered under this section shall authorize the interception of any wire, electronic or oral communication for a period of time in excess of that necessary under the circumstances." N.J.S.A. 2A:156A-12 (emphasis added). Section 12 also requires that reasonable efforts be made to reduce the hours of interception, whenever possible -- a mandate referred

34

to as extrinsic minimization.  Ibid.; State v. Catania, 85 N.J.

418, 423 (1981).[4]

The Act does not expressly require "that the hours of

interception be specified in the order."  State v. Dye, 60 N.J.

518, 527 (1972) (citing State v. Christy, 112 N.J. Super. 48,

77-78 (Law Div. 1970)).  As then-Judge Handler explained, the

measure in the statute -- "necessary under the circumstances" --

is a "flexible and relative concept" that is infused with

content by other parts of the law.  Christy, supra, 112 N.J.

Super. at 59.  The phrase is meant to limit wiretapping to the

period of time the "judge determines is required to uncover

incriminating" conversations about "particular criminal

activities and participants.  This may require a greater or

lesser time, depending upon all of the circumstances."  Ibid.

Because the phrase suggests a limit on the number of hours,

it is preferable to specify the hours of interception in the

order, if possible.  See State v. Sidoti, 120 N.J. Super. 208,

213 (App. Div. 1972); Christy, supra, 112 N.J. Super. at 78.

The decision is left to the reasonable discretion of the wiretap

---

[4]  The Wiretap Act also requires "intrinsic" minimization:
terminating the interception of individual non-relevant phone
calls "as it becomes apparent to the monitors that the call is
not relevant to the investigation."  Catania, supra, 85 N.J. at
429.

judge and is reviewed for abuse of discretion.  Dye, supra, 60 N.J. at 527-28.

Certain types of criminal activity defy specificity.  In Sidoti, supra, for example, the Appellate Division explained that "bookmaking is a continuing operation, carried on with a myriad of persons."  120 N.J. Super. at 213.  Although it would be "desirable for an order to" specify what hours "the tap should last," the panel noted that bookmaking resists that type of specificity.  Ibid.  The court explained that, "absent the ability to be more specific," wiretap orders that do not state the hours of interception but otherwise provide for minimization can be valid.  Id. at 213-14.

In State v. Pemberthy, 224 N.J. Super. 280, 299 (App. Div.), certif. denied, 111 N.J. 633 (1988), the Appellate Division held that the reasoning in Sidoti extended to a conspiracy to import and distribute narcotics.  The order in Pemberthy permitted 24/7 surveillance for a conspiracy that involved "day-to-day dealings with drug shipments, and making arrangements for transportation which involved various family members."  Ibid.  Although the State attempted to limit the actual hours of interception, it noted the likelihood that calls would be placed outside those hours to arrange drug shipments. Ibid.  Under the circumstances, the panel concluded that greater

"specificity of hours" in the order was "neither required nor reasonable." Ibid.

Here, there was no abuse of discretion. The court's orders allowed interception twenty-four hours a day, seven days a week, but, consistent with section 12, directed the Task Force to make reasonable efforts to reduce those hours whenever possible. The Task Force repeatedly represented that it would initially intercept calls during more limited hours. Starting with the first application for 5WT, the Task Force stated that it planned to intercept calls from 9:00 a.m. to 1:00 a.m. The application also explained that "certain events could occur (i.e. an impending shipment of CDS, gathering of money, problems at an open air drug distribution location, etc.) that would generate telephone calls at any time during the day or night."

The wiretap judge found that, "[d]ue to the extent of the target's" large-scale narcotics ring, "it was expected that the CDS transactions could occur at random times at diverse hours of the day and night." Despite plans to limit interception "to a specific window of time," the judge observed that "it quickly became apparent that the targets conducted sales of CDS at unpredictable times, most occurring outside the given window."

Under the circumstances, we cannot find that it was an abuse of direction to allow 24/7 monitoring in this investigation. We recognize that the nature of a large-scale

37

narcotics distribution ring may involve unpredictable hours that can justify 24/7 interception in certain cases.  Still, the preferred practice is to specify more limited hours of interception in a wiretap order whenever possible.  See Sidoti, supra, 120 N.J. Super. at 213; Christy, supra, 112 N.J. Super. at 78.

V.

Finally, defendant claims that the State did not present sufficient evidence before the grand jury to support the charge that he was a leader of a narcotics trafficking network, contrary to N.J.S.A. 2C:35-3.  Based on our review of the record, we do not agree.

An indictment is presumed valid and should only be dismissed if it is "manifestly deficient or palpably defective." State v. Hogan, 144 N.J. 216, 229 (1996).  A motion to dismiss is addressed to the discretion of the trial court, State v. McCrary, 97 N.J. 132, 144 (1984), and that discretion should not be exercised except for "the clearest and plainest ground," State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 18 (1984) (citations omitted).

At the grand jury stage, the State is not required to present enough evidence to sustain a conviction.  Id. at 27.  As long as the State presents "some evidence establishing each element of the crime to make out a prima facie case," a trial

court should not dismiss an indictment. State v. Saavedra, 222 N.J. 39, 57 (2015) (quoting State v. Morrison, 188 N.J. 2, 12 (2006)). In a nutshell, a court examining a grand jury record should determine whether, "viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it." Morrison, supra, 188 N.J. at 13.

N.J.S.A. 2C:35-3 provides as follows:

> A person is a leader of a narcotics trafficking network if he conspires with two or more other persons in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State . . . any controlled dangerous substance classified in Schedule I or II . . . as a financier, or as an organizer, supervisor or manager of at least one other person.

The State, therefore, needed to present "some evidence" of each of the following elements to establish a prima facie case:

> (1) that defendant conspired with two or more persons;
>
> (2) that the purpose of the conspiracy included a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into, or transport in this State . . . any controlled dangerous substance classified in Schedule I or II;
>
> (3) that defendant was a financier or that defendant was an organizer, supervisor or manager of at least one other person; and

39

(4) that defendant occupied a high-level position in the conspiracy.

[See N.J.S.A. 2C:35-3; Model Jury Charges (Criminal), "Leader of Narcotics Trafficking Network" (Oct. 23, 2000); see also State v. Afanador, 151 N.J. 41, 54-55 (1997) (interpreting prior version of statute); State v. Alexander, 136 N.J. 563, 568, 570-71 (1994) (same).][5]

The trial judge carefully reviewed the grand jury record and found that the State presented ample evidence to support each element of the offense. As to the first element, the trial court found that defendant conspired with "numerous persons," including Cuevas, Kearny, Carmichael, Cordero, defendant's supplier in New York, and others. For the second element, the trial court recounted "substantial evidence" of a conspiracy to distribute heroin, ecstasy, marijuana, and cocaine, and to bring into or transport heroin into New Jersey. For the third and fourth elements, the judge reviewed Investigator Dunlap's grand jury testimony to show that defendant was either a financier or an organizer, supervisor or manager of at least one other person, and that he occupied a high-level position in the conspiracy. The court cited evidence that defendant, as a financier, purchased drugs up front, delivered them to a drug set, and received the proceeds once others sold the narcotics.

---

[5] The Model Jury Charge questions whether the fourth element applies to financiers. See Model Jury Charges (Criminal), supra, at 3 n.8. We need not address that issue in this case.

40

The court also referred to evidence about how defendant resupplied a drug set. In addition, the trial judge cited multiple examples from the grand jury about how defendant managed the supply operations and directed other members of the conspiracy. Among other passages, the court cited testimony in which defendant instructed Carmichael to rent cars to travel to New York and purchase drugs; discussed staffing a set and posting bail for a member who had been arrested; discussed the source of drugs to be supplied to various sets; directed Kearny to recruit bulk heroin buyers who previously bought from a dealer who had been arrested; and supplied packaged heroin to several drug sets in Camden. Like the Appellate Division, we agree that there was ample evidence before the grand jury to show that defendant was a leader of a narcotics network.

State v. Ellis, 424 N.J. Super. 267 (App. Div. 2012), on which defendant relies, is distinguishable. The defendant in Ellis "engaged in six drug transactions with an undercover police officer [in an eleven-week period] wherein a total of less than $2,000 was exchanged for over one-half ounce of cocaine and .29 grams of heroin." Id. at 270. The defendant sent others to complete two of the transactions. Ibid. The panel held that the proofs did not establish the elements of a leader of a narcotics trafficking network charge and vacated that conviction. Id. at 278. Defendant Feliciano's high-level

role in a broad-ranging, extended narcotics conspiracy went well beyond the evidence presented in <u>Ellis</u>.

VI.

For the reasons stated above, we modify and affirm the judgment of the Appellate Division.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON, and JUDGE CUFF (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion. JUSTICE FERNANDEZ-VINA did not participate.

SUPREME COURT OF NEW JERSEY

NO.   ___A-24___                          SEPTEMBER TERM 2014

ON CERTIFICATION TO _____Appellate Division, Superior Court_____


STATE OF NEW JERSEY,

    Plaintiff-Respondent,

            v.

HECTOR FELICIANO (a/k/a HECTOR FELECIANO),

    Defendant-Appellant.


DECIDED _____March 9, 2016_____
_____Chief Justice Rabner_____          PRESIDING
OPINION BY _____Chief Justice Rabner_____
CONCURRING/DISSENTING OPINIONS BY _____
DISSENTING OPINION BY _____

| CHECKLIST | AFFIRM AS MODIFIED | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | ----------------------- | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |