37 A.3d 542

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. SAEED T. ELLIS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 23, 2012—Decided March 6, 2012.

Before Judges PARRILLO, ALVAREZ and SKILLMAN.

*Joseph E. Krakora,* Public Defender, attorney for appellant (*Brian Plunkett,* Assistant Deputy Public Defender, of counsel and on the brief).

*Peter E. Warshaw, Jr.,* Monmouth County Prosecutor, attorney for respondent (*Patricia B. Quelch,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

Tried by a jury, defendant Saeed Ellis was convicted of fifty-three drug-related counts including second-degree conspiracy to distribute a controlled dangerous substance, *N.J.S.A.* 2C:35–5b(2) and *N.J.S.A.* 2C:5–2, and first-degree leader of a narcotics traf-

ficking network, *N.J.S.A.* 2C:35–3. The conspiracy was merged with the "kingpin" offense, for which defendant was sentenced to life imprisonment with a twenty-five year period of parole ineligibility. Sentences on the remaining counts were all made to run concurrent. On appeal, defendant challenges his drug kingpin conviction, arguing that his motion for judgment of acquittal should have been granted. We agree, and accordingly vacate that conviction, unmerge the conspiracy count and remand for resentencing thereon.

According to the State's proofs, during an eleven-week period from February 21, 2006 to May 3, 2006, defendant engaged in six drug transactions with an undercover police officer wherein a total of less than $2,000 was exchanged for over one-half ounce of cocaine and .29 grams of heroin. In two of the transactions, defendant did not directly participate and sent others to complete the sale.

This surveillance operation commenced in February 2006 when a confidential informant (CI) advised the Monmouth County Prosecutor's Office (MCPO) that defendant, known as "King[,]" was dealing drugs. Pursuant to plan, and backed up by police officers providing security and surveillance, the CI and undercover detective, Adam Pharo of the Manasquan Police Department assigned to the MCPO Narcotics Strike Force, met defendant inside a Neptune residence on February 21, 2006. After being introduced by the CI, Pharo purchased three bundles (.29 grams) of heroin and one gram of crack cocaine from defendant for $300. Following this transaction, Pharo and defendant exchanged phone numbers.

The next five encounters, save one, were initiated by Pharo. On February 28, 2006, Pharo contacted defendant directly and arranged to purchase "5 Gs of hard[,]" meaning five grams of crack cocaine, for $250 to $260. They agreed to meet on the corner of Pharo and Division Streets in Neptune. Pharo arrived alone and while waiting in his car, received a call from defendant, who said he would be sending "his brother" in his place and that he would

be arriving in five minutes driving a greenish grey four-door Oldsmobile. Soon after the call, a car fitting that description pulled up next to Pharo's and a male, later identified as Dorian Tyler, exited. Tyler handed Pharo a bag of crack cocaine in exchange for $260. When Pharo later discovered that the amount of crack cocaine was 2.7 grams less than he ordered, he telephoned defendant, who said he would "make good on it next time...." Pharo and defendant also exchanged Nextel direct-connect phone numbers.[1]

On March 6, 2006, Pharo reached defendant via direct-connect telephone and told him he wanted another five grams of crack cocaine, plus the shortage owed from the previous transaction. When Pharo approached the meeting spot, at the corner of Embury and Atkins Avenues in Neptune, he received a call from defendant, who advised that he would be "sending a guy in a yellow shirt...." After a few minutes, a short, stocky male wearing a bright yellow sweatshirt, later identified as Robert Carter, walked up to Pharo's car and asked if he was waiting for defendant. When Pharo replied in the affirmative, Carter entered Pharo's vehicle, and produced 6.35 grams of cocaine. After checking the weight on his scale, Pharo handed Carter the money. Carter then exited the car. Pharo later called defendant to thank him and let him know he would be in touch.[2]

On March 28, 2006, Pharo again contacted defendant to purchase another five grams of crack cocaine for $250. They arranged to meet at the same location—the corner of Atkins and Embury Avenues. At around 10:45 a.m., defendant arrived there on foot and completed the transaction with Pharo. The next contact, on April 17, 2006, was initiated by defendant who asked

---

[1] Direct-connect is a two-way radio feature on Nextel phones, which operates like a walkie-talkie.

[2] Shortly after the transaction, Carter was arrested on an outstanding municipal warrant, but was not charged with the sale of the CDS to Pharo, lest the Strike Force's ongoing investigation of defendant be exposed.

Pharo where he had been. Again, arrangements were made to purchase five grams of crack cocaine for the same price—$250. The exchange took place at around 4:15 p.m. that same day, this time at the corner of Atkins Avenue and Division Street in Neptune.

The final transaction between the two occurred on May 3, 2006, when Pharo telephoned defendant and arranged to purchase another five grams of crack cocaine, and "a little extra" since Pharo was willing to pay $260 this time. The two met on the corner of Pharo and Division Streets in Neptune, where the transaction was consummated.

Overall, Pharo purchased 23.1 grams of crack cocaine from defendant, or a little over one-half ounce. All of the transactions occurred in a drug-free zone, within 1,000 feet of a school, 500 feet of a public housing facility, or both.

Defendant, who testified on his own behalf, admitted selling drugs to Pharo on February 21, 2006, March 28, 2006, April 17, 2006 and May 3, 2006 and referred to himself as a "street hustler." He also admitted that on March 6, 2006, he asked Carter to complete the sale to Pharo because his girlfriend was about to give birth, which she did the next day. For his efforts, Carter, who was the superintendent of the building where defendant's brother resided, was compensated with money and drugs. Defendant, however, denied any involvement in the drug sale completed by Tyler on February 28, 2006, even though he and Tyler had sold drugs on the same block together and defendant had sold drugs to Tyler on multiple occasions in the past.

On rebuttal, Tyler explained that he acquired drugs from defendant on credit to feed his longstanding addiction. To repay his debt, Tyler made between fifteen to twenty-five drug deliveries for defendant from February 20 to March 3, 2006, mostly on Division Street, and always returned with at least $100 for defendant. He estimated that he brought back between $2,500 and $4,000 to defendant. Tyler continued to do so even after the debt was repaid, receiving drugs as payment for his efforts. Tyler also

personally observed defendant give Carter drugs to make runs and also to hold for customers who would come through the building.[3]

Defendant was found guilty of all counts and now appeals from his first-degree conviction of being a leader of a drug trafficking network under *N.J.S.A.* 2C:35–3.[4] His principal argument is that the judge erred in denying his motion for judgment of acquittal because a reasonable jury could not find guilt beyond a reasonable doubt. We agree.

At the close of the State's evidence, defendant moved under *Rule* 3:18–1 for a judgment of acquittal as to all counts. In denying the motion with respect to the "kingpin" count, the trial judge reasoned that "a jury could infer that [defendant] controlled both [Tyler and Carter] in the delivery of drugs to the undercover officer."

"At the close of the State's case ..., the court shall ... order the entry of a judgment of acquittal ... if the evidence is insufficient to warrant a conviction. *R.* 3:18–1. However, a trial court must deny the defendant's motion if " 'viewing the State's evidence in its entirety ... and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt ... beyond a reasonable doubt.' " *State v. Wilder,* 193 *N.J.* 398, 406, 939 *A.2d* 781 (2008) (quoting *State v. Reyes,* 50 *N.J.* 454, 458–59, 236 *A.2d* 385 (1967)). On appeal, we utilize the same standard as the trial court in determining whether a judgment of acquittal was warranted. *State v. Felsen,* 383 *N.J.Super.* 154, 159, 890 *A.2d* 1029 (App.Div.2006).

Under the "kingpin" statute, *N.J.S.A.* 2C:35–3:

---

[3] Tyler was arrested based on the events of February 28, 2006, and was charged with various drug offenses, eventually pleading guilty. As part of his plea agreement, he agreed to testify against defendant if necessary.

[4] Also known as the " 'drug kingpin' statute." *State v. Alexander,* 136 *N.J.* 563, 565, 643 *A.2d* 996 (1994).

> A person is a leader of a narcotics trafficking network if he conspires with two or more other persons in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State ... any controlled dangerous substance classified in Schedule I or II ... as a financier, or as an organizer, supervisor or manager of at least one other person.

This provision was enacted as part of the Comprehensive Drug Reform Act of 1986, *L.* 1987, *c.* 106, § 1. *N.J.S.A.* 2C:35–1 to –24. Its express purpose is to target and severely punish "upper echelon members of organized narcotics trafficking networks...." *N.J.S.A.* 2C:35–1.1c; *see also State v. Afanador,* 134 *N.J.* 162, 186, 631 *A.*2d 946 (1993) (O'Hern, J., dissenting) (*Afanador I* ). Indeed, this crime has been analogized to that of being a leader of organized crime under *N.J.S.A.* 2C:5–2g. *State v. Ball,* 141 *N.J.* 142, 174, 661 *A.*2d 251 (1995). Patterned after the organized crime statute, *N.J.S.A.* 2C:5–2g, and given the gravity of the penalty provided, including the explicit limitation on the *N.J.S.A.* 2C:1–8 doctrine of merger, the clear legislative intent is that the "kingpin" provision "be read narrowly and not applied to every drug sale operation." Cannel, *New Jersey Criminal Code Annotated,* comment 1 on *N.J.S.A.* 2C:35–3 (2011).

A conviction under the "kingpin" statute requires:

> (1) that the defendant conspired with at least two others; (2) that the defendant was an organizer, supervisor, financier, or manager; (3) that the defendant engaged in the conspiracy for profit; and (4) that the conspiracy included a scheme or course of conduct unlawfully to manufacture, distribute, dispense, or transport a controlled dangerous substance....
>
> [*Alexander, supra,* 136 *N.J.* at 568, 643 *A.*2d 996.]

Clearly, "the status or position of the defendant [is] a material element of the crime." *Id.* at 570, 661 *A.*2d 251. Thus, to be considered, a person must have *supervisory* power over at least two other persons with whom he has conspired in a drug trafficking scheme. *Afanador I, supra,* 134 *N.J.* at 172, 631 *A.*2d 946. Adopting a restrictive interpretation of this element, the Court in *Alexander* required for conviction that the jury find that

> the defendant occupies a high-level position, that is, a position of superior authority or control over other persons, in a scheme or organization of drug distribution (or manufacturing or dispensing or transporting) and that in that position the defendant exercised supervisory power or control over others engaged in an organized drug-trafficking network.

[136 *N.J.* at 570–71, 643 *A.2d* 996.]

■ The definitions of the terms "organizer," "supervisor," "financier," and "manager," adopted by the Court in *Alexander*, all mirror this requirement. For instance, an "organizer" is described as "a person who arranges, devises, or plans a drug-trafficking network." *Id.* at 575, 643 *A.2d* 996; *see also Afanador I, supra,* 134 *N.J.* at 173, 631 *A.2d* 946 (concluding that a defendant violates the statute as an organizer "only if the defendant exercises some ability to dictate the conduct of others in a drug trafficking scheme"). So characterized, it is evident that "the role of a defendant as a leader or drug kingpin turns more on the nature of that person's authority, the magnitude or extent of control, and the number of persons over whom that power is exercised." *Alexander, supra,* 136 *N.J.* at 575, 643 *A.2d* 996; *see also State v. Afanador,* 151 *N.J.* 41, 55, 697 *A.2d* 529 (1997) (*Afanador II* ). A defendant's position or status, then, "must be at a superior or high level in relation to other persons in the drug trafficking network and that the defendant's role must be that of a 'leader' in the drug organization or system...." *Alexander, supra,* 136 *N.J.* at 574, 643 *A.2d* 996. In other words, the position within the organization must be "significant" and "important," wielding substantial authority and control over its operations. *Id.* at 575, 643 *A.2d* 996.

■ Another material element of the crime is the existence of a drug trafficking scheme, network or system. Although, to qualify, such an entity "need not have any specific configuration or chain of command[,]" *ibid.,* nonetheless the Legislature obviously contemplated "an organization of persons who are collectively engaged in drug activities" and operating within a structured framework, be it vertical or horizontal. *Ibid.*

■ The State's case-in-chief established neither of these material elements of the drug kingpin offense. As noted, "the Legislature obviously intended that the drug trafficking conspiracy involve at least three persons: the kingpin defendant and two others." *Afanador I, supra,* 134 *N.J.* at 173, 631 *A.2d* 946.

Absent here, however, is proof of the requisite connectiveness amongst the trio, namely, of any structured relationship, much less of defendant's superior position within, at least in the sense of exercising control or authority over the other two. At most, it appears that Tyler and Carter participated in just two of the six drug transactions arranged by defendant over a short period of time. Moreover, their participation was durationally brief, spatially contained, and limited in scope. They operated separate and apart from each other and merely as an accommodation to defendant, at his request rather than command; their stake in the venture was restricted simply to compensation in kind. And while defendant may have provided the drugs and instructed the runners as to the time, location and terms of the deal, there is no evidence that defendant controlled, ordered or dictated their actions.

■ Although all three persons need not have acted in concert at the same time and place, there is no proof from which it can be reasonably inferred that the trio ever acted "collectively" as part of a single group, much less a continuing organized drug trafficking network. On the contrary, at defendant's behest, Tyler and Carter acted individually and never together. Each substituted for defendant on just a single occasion, after which his assistance terminated. Indeed, Tyler's completion of the one drug transaction on February 28, 2006, and Carter's completion of another, a week later on March 6, 2006, establish at most that defendant engaged in two separate, stand alone, two-person conspiracies, on different dates, with different persons. Furthermore, each deal averaged less than five grams of cocaine in exchange for less than $300 in cash. Thus, neither the overall quantity of drugs, the number of participants, nor the frequency or relatedness of transactions suggests an organized drug trafficking network within the meaning of *N.J.S.A.* 2C:35–3.

The present facts differ significantly from those in *State v. Burgess,* 154 *N.J.* 181, 712 *A.*2d 631 (1998), which showed that the defendant operated a drug distribution network and employed several people to help him run it—one who sold the drugs;

another two individuals who replenished the supply when the cocaine was sold; another "strong arm" man to collect debts; and yet another individual, who would take trips to New York City to buy cocaine for defendant and help defendant package the drugs for retail sale. *Id.* at 186, 712 *A.*2d 631. The defendant, as the leader of the conspiracy, kept himself well insulated from these activities. *Ibid.* On these facts, the Court found a sufficient basis for a reasonable jury to find that the defendant was a drug kingpin. *Id.* at 186–87, 712 *A.*2d 631.

In *Afanador I, supra,* although somewhat more equivocal, the proofs nevertheless supported a finding that the defendant exerted substantial control over several people to engage in drug dealing for profit, and that their actions occurred within the structured framework of a drug distribution network. 134 *N.J.* at 176–77, 631 *A.*2d 946. There, the defendant ordered an associate to find a scale for the drug transaction, and ordered another associate to count money from these transactions and to obtain large amounts of cocaine for other deals. *Ibid.* Moreover, the defendant claimed to have been in the drug trade for twenty years with people on the street owing him large sums of money from prior drug deals, and engaged in activity encompassing large numbers of vehicles making quick entrances and exits. *Id.* at 177, 631 *A.*2d 946.

In contrast, the State proofs in its case-in-chief establish none of the essential elements of authority, control and structure to support a drug kingpin conviction. That defendant may have instructed either Tyler or Carter as to the details of a particular transaction does not establish the nature of the relationship among the three. And the fact that Tyler completed one drug deal for defendant, and Carter another, is simply insufficient to allow the inference that defendant held a high-level position in a drug trafficking network in which he exerted substantial authority over the other two, or that the three acted collectively in a drug distribution scheme. Indeed, without more, the jury was left to speculate as to the existence of the material elements of the drug kingpin crime. Because reasonable minds could not find guilt

beyond a reasonable doubt at the close of the State's case, the trial judge was obliged to grant defendant's timely motion for judgment of acquittal. Accordingly, we vacate defendant's conviction under *N.J.S.A.* 2C:35–3.

In light of this disposition, we need not consider defendant's other claims as they relate to this crime. With respect to defendant's other convictions, to the extent defendant's claim of prejudice in the repeated references to defendant's nickname "King" and to uncharged conspiracies amount to error, they are harmless beyond a reasonable doubt given defendant's admissions of guilt. *State v. Macon,* 57 *N.J.* 325, 338, 273 *A.*2d 1 (1971).

Accordingly, we vacate the drug kingpin conviction, otherwise affirm the judgment of conviction with the conspiracy count unmerged, and remand the matter for resentencing thereon.