**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4779-16T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOSE M. CORTES, a/k/a JOSE
CORTEZ,

    Defendant-Appellant.

_____

Argued September 16, 2019 – Decided  October 1, 2019

Before Judges Sabatino and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-05-1578.

Peter T. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Peter T. Blum, of counsel and on the brief).

Maura M. Sullivan, Assistant Prosecutor, argued the cause for respondent (Mary Eva Colalillo, Camden County Prosecutor, attorney; Maura M. Sullivan, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

After a jury trial, defendant Jose M. Cortes (whose nickname the State contends is "Pep") was found guilty of first-degree acting as a leader of a narcotics trafficking network, N.J.S.A. 2C:35-3; first-degree conspiracy to murder Jose Vega, N.J.S.A. 2C:11-3(a)(1)(2); first-degree conspiracy to murder Christopher Humphrey; N.J.S.A. 2C:11-3(a)(1)(2); and various weapons offenses, including first-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) and (j), and a second-degree "certain persons" violation, N.J.S.A. 2C:39-7(b)(1).

The trial court sentenced defendant to a mandatory extended term of life in prison with a thirty-year period of parole ineligibility on the narcotics trafficking offense. In total, the aggregate sentence amounted to life in prison plus seven years, subject to a thirty-five-year parole disqualifier.

On appeal, defendant argues for a new trial based on the admission of inadmissible and harmful hearsay evidence. Defendant also makes a number of sentencing related arguments. In a pro se supplemental brief defendant argues that the trial court should have granted his motions for acquittal at the close of

the State's case. For the reasons that follow, we affirm defendant's convictions but remand for his conspiracy offenses.

## I.

The State's evidence showed that defendant had co-managed a drug distribution enterprise selling cocaine and heroin out of a house on Fourth Street in Camden. The State's two key fact witnesses were Jessica Savage, a drug addict who frequently bought drugs at the house and sometimes acted as a lookout; and Robert Thompson, a cocaine user who also regularly bought drugs at the house. Savage and Thompson each observed the drug-related activities in the house. They both noticed a gun was kept there, evidently to be used as needed.

As to the murder victims, Humphrey worked as a lookout and Vega worked as a dealer for the organization. In late December 2013, Humphrey told a friend that he and Vega were going out on their own and starting a drug distribution "set." Around that same time, Savage learned that Vega had been selling the heroin of another competing supplier out of the house.

In late December 2013, Humphrey and Vega disappeared. Eventually, their dead bodies were discovered by a woman walking a dog. They had been shot to death, and their bodies had been dropped several feet into the woods without any drag marks. Police obtained a search warrant of the house in

3

Camden. As they were conducting the search, people upstairs threw out of the second-story window 126 bags of heroin and twenty-nine bags of powder cocaine.

The police found DNA from Humphrey's blood on a wall on the right side of the front door of the house, and DNA from Vega on swabs from the leg of a pool table. In addition, cellphone records show that defendant's phone connected to towers near the drug house and where the victims' bodies were found on the day of the murders. Further, DNA testing from the tailgate of defendant's pickup truck identified Humphrey as the source of DNA from at least one of the specimens, and Vega as matching the minor DNA profile of one of the other specimens.

Defendant did not testify at trial. He moved for a judgment of acquittal at the end of the case and that motion was denied.

In his attorney's brief on appeal, defendant argues:

POINT I

A NEW TRIAL SHOULD BE GRANTED BECAUSE OF IMPROPER HEARSAY THAT THE DRUG HOUSE WAS KNOWN AS "PEP'S HOUSE," THUS SUPPORTING THE PROSECUTOR'S THEORY THAT THE DEFENDANT—NICKNAMED "PEP"— WAS THE BOSS WHO WAS RESPONSIBLE FOR THE CHARGED CRIMES. U.S. CONST. AMENDS. VI, XIV; N.J. CONST. ART. I, PARA. 10.

POINT II

THE TWO CONSPIRACY COUNTS SHOULD HAVE MERGED. U.S. CONST. AMENDS. V, XIV; N.J. CONST. ART. I, PARA. 1.

POINT III

ALL OF THE GUN POSSESSION COUNTS SHOULD HAVE MERGED. U.S. CONST. AMENDS. V, XIV; N.J. CONST. ART. I, PARA. 1.

POINT IV

THE EXTENDED TERM FOR LEADER OF A NARCOTICS NETWORK SHOULD BE REDUCED TO THE REGULAR TERM BECAUSE THE PROSECUTOR'S MOTION TO IMPOSE AN EXTENDED TERM WAS INEXPLICABLY LATE.

Additionally, defendant raises these points in a pro se supplemental brief:

THE TRIAL COURT ERRED IN DENYING THE DEFENSE'S MOTION FOR A JUDGMENT OF ACQUITTAL (Raised Below).

A. CONSPIRACY TO COMMIT MURDER.

B. LEADING A NARCOTICS TRAFFICKING NETWORK.

C. POSSESSING A HANDGUN.

II.

5

The main issue defendant raises on appeal is his contention that Thompson's testimony for the State implied that non-testifying persons referred to the premises of the drug dealing as "Pep's house." According to defendant, Thompson's testimony prejudicially conveyed to the jury hearsay assertions from those other unnamed persons, and their belief that "Pep" ran the drug house.

The disputed testimony occurred in the course of Thompson's direct examination by the prosecutor. The following exchange transpired, interrupted by an objection by defendant's trial counsel that the trial judge sustained:

> [THE PROSECUTOR]: Mr. Thompson, you were saying a moment ago that you didn't really hang out with the guy [who appeared to be in charge of the drug house]. Did you see him at the house?
>
> A. A few times, yeah.
>
> Q. What was his relation to the house, if you know, based on you observations?
>
> A. For the most part, you know, <u>when I heard about the house or anybody would talk about the house</u> –
>
> [DEFENSE COUNSEL]: Objection, Judge. This is going to be calling for hearsay.
>
> THE COURT: Counsel, rephrase.
>
> [THE PROSECUTOR]: I'll rephrase – I'll rephrase the question.

A-4779-16T3

Q. Mr. Thompson, what would – I think you were starting to talk about what people – what other people would say about the house?

A. What it was called, yeah, it was –

Q. What would you call the house?

A. Pep's house is –

Q. Did you make any observations – and leaving to one side for a second what other people said, okay?
A Okay.

Q. I just want to talk about what you yourself observed. Did you ever observe the defendant at this house that you pointed out in the photo and you referred to as Pep's house?

A Yes.

[(Emphasis added)].

This was not the only trial testimony stating that the premises were known as "Pep's house." Before Thompson took the stand, Savage testified that "[t]he bags [of drugs] that came out of Pep's house always said [']kiss['] on them." (emphasis added).

During closing argument, the prosecutor made multiple references to the drug dealing premises being known as "Pep's house."

7

Now here – here's a picture of the State's Exhibit 163, this is what <u>the witnesses referred to as Pep's house</u>, the address is [number omitted] South 4th Street.

. . . .

So Chris Humphrey and Jose Vega, they start selling their drugs <u>out of Pep's house</u>. . . .

And the tie into that, the fact that their ultimate goal is to set up shop around the corner, or somewhere else in Camden, tells you why they would start selling <u>out of Pep's house</u>, because it's easier that way, right?

. . . .

Chris and Jose Vega's ultimate plan is to lure customers <u>from Pep's house</u> to their own location.

. . . .

And you have Robert Thompson who buys drugs <u>from Pep's house</u>. Sometimes he has to wait for the defendant to re-up when he goes in there.

[(Emphasis added).]

Notably, defense counsel did not object to these portions of the State's summation.

Defendant argues that Thompson's testimony prejudicially conveyed hearsay to the jurors about his alleged connection as "Pep" to the house where the drug sales occurred, and that the prosecutor unfairly punctuated those

references during the closing arguments.  He contends this had a clear capacity to produce an unjust verdict, and that he is thereby entitled to a new trial.

For starters, we are unpersuaded that Thompson conveyed inadmissible hearsay to the jury.  Hearsay consists of "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  N.J.R.E. 801(c).  Hearsay evidence is inadmissible unless a relevant exception applies.  N.J.R.E. 802.

A close inspection of the Thompson colloquy shows that he seemed to be on the verge of telling the jurors what other people called the premises when defendant's trial attorney interjected an objection.  The transcript reflects that Thompson did not finish that answer.  The objection appears to have been made in time.  The trial judge sustained it, by directing the prosecutor to rephrase the question.  The prosecutor complied, by asking Thompson what would "you" (meaning Thompson) call the house?  Thompson then uttered "Pep's house."

Defendant contends the prosecutor and Thompson were talking over one another, and the jury might have construed his words "Pep's house" to relate back to the earlier disallowed question about what "others" said, rather than relating the ensuing query about what Thompson called it personally.  Although this interpretation is plausible, we are unpersuaded the exchange produced a

clear instance of error.  Moreover, defense counsel made no effort to have the judge strike the "Pep's house" response, or instruct the jury to disregard it.

Even assuming, for the sake of discussion, we adopt defendant's claim that the jurors construed Thompson's reference to "Pep's house" to encompass hearsay assertions by other people, that hypothetical construct was merely cumulative.  First of all, Thompson himself testified that he knew the premises as "Pep's house."  His expression of that belief is an appropriate lay opinion, based upon his on personal knowledge.  See N.J.R.E. 701 (allowing lay opinions that are "rationally based on the perception of the witness," and which will assist the trier of fact); N.J.R.E. 602 (the personal knowledge requirement).  This is not a situation of a police officer witness implying to jurors that he "possesses superior knowledge, outside the record, that incriminate the defendant."  State v. Branch, 182 N.J. 338, 351 (2005).  Thompson, a lay witness, told the jurors what he personally knew, which is allowable under both Evidence Rules 602 and 701.  The restricting principles of Branch were not violated here.

Further, the alleged implication that Thompson conveyed to the jury that other people also called the premises Pep's house actually was corroborated in the State's favor by Savage's testimony.  As we have already noted, Savage likewise called the premises "Pep's house."  Her testimony on this point was not

objected to by defense counsel.  In addition, as we have noted, defense counsel did not object to the prosecutor's references to "Pep's house" in summations. When defense counsel fails to object to a prosecutor's remarks at trial, a "reviewing court may infer that counsel did not consider the remarks to be inappropriate."  State v. Vazquez, 265 N.J. Super. 528, 560 (App. Div. 1993); see also State v. Nelson, 173 N.J. 417, 471 (2002) (same).

We reject defendant's argument that the trial court, sua sponte, should have instructed the jury pursuant to N.J.R.E. 403 to ignore any suggestion that "other people" called the premises "Pep's house."  N.J.R.E. 403 is a discretionary rule, providing that a trial judge "may" exclude unduly prejudicial proof only if its harmful characteristics "substantially outweigh" its probative value.  We are unconvinced the court was obligated to take such a discretionary measure here.

In light of our analysis, we discern no harmful error rising to a level indicative of a mistake "clearly capable of producing an unjust result."  R. 2:10-2.  There was other circumstantial proof of defendant's role in the drug activities at the premises and, moreover, of his involvement in a conspiracy to take the lives of two disloyal people (Humphrey and Vega) who were attempting to undermine his drug network.  The brief portion of Thompson's testimony focused upon by defendant did not manifestly deprive him of a fair trial.

11

III.

Except for a discrete sentencing merger on the conspiracy counts, none of the other issues presented by defendant and his appellate counsel have any merit. R. 2:11-3(e)(2). Only a few comments are in order.

A.

We reject defendant's pro se contention the verdict was against the weight of the evidence and that the trial court should have granted his counsel's motion for a judgment of acquittal. There was ample evidence, viewed in a light most favorable to the State, from which "a reasonable jury could find guilty of the [various] charge[s] beyond a reasonable doubt." State v. Reyes, 50 N.J. 454, 459 (1967); see also R. 3:18-1.

With respect to the two conspiracy-to-murder convictions, Savage's testimony that defendant was one of the bosses of the drug house, and that Vega was selling someone else's drugs at the location, provided a clear motive for defendant to have wanted the victims killed. Furthermore, Savage's testimony that defendant and Jorge Lopez, another drug dealer at the house, were both in defendant's truck when she returned with the bags that Vega was selling provided a basis for a jury to find that they could have discussed killing the victims.

Further, the victims' blood was found in the house, forensic proof which could support a rational inference that they were killed there after Savage told defendant and Lopez about Vega's transgression. In addition, some of the victims' blood was found in defendant's truck, providing a reasonable basis for an inference that defendant participated in transporting the bodies, or at least lent the use of his vehicle for purposes their transport.

The police testimony that there were no drag marks by the bodies helped support an inference that multiple people must have been involved in disposing of the bodies. Furthermore, cellphone evidence showed that defendant's phone was near where the victims' bodies were found on the night of December 21. Taken together, this evidence provided a reasonable basis for a jury to conclude that defendant conspired with other individuals to murder the victims.

As to defendant's drug trafficking conviction under N.J.S.A. 2C:35-3, the State's evidence provided sufficient details about the operation of the Fourth Street drug house and defendant's role in it. Savage testified that defendant was one of two "bosses" of the drug house on Fourth Street. Testimony from her and Thompson showed that both heroin and cocaine were sold from this location. Thompson testified that defendant would resupply the location when it ran out of drugs. When police raided the home, they found 126 bags of heroin

13

and 29 bags of powder cocaine as well as $3,096 in cash. This was hardly a small scale operation, but instead one that satisfied the narcotics trafficking network element of N.J.S.A. 2C:35-3.

This case is unlike State v. Ellis, 424 N.J. Super. 267 (App. Div. 2012), in which we concluded the State had failed to prove the requisite "connectiveness" between the people involved in selling drugs. In Ellis, there was limited proof about the number of drug transactions and the quantities involved. The State's evidence in that case showed only two "runners" had provided drugs on one occasion to an undercover officer, and each transaction averaged less than five grams of cocaine. Id. at 276.

Here, Savage and Thompson provided ample testimony establishing the characteristics of a narcotics trafficking network led, or co-led, by defendant. Savage identified multiple drug dealers working at the house. Those sellers may have been responsible for obtaining and paying their own lookouts, but Savage explained that the dealers gave their customers' money to either defendant or the other alleged leader known as "Big Andy." The uniformity in narcotics products was shown by Savage's testimony that the bags sold at the house "always said 'kiss' on them." Savage explained that selling drugs without this label "messed with Lopez" and defendant's money. This reasonably establishes there was

control over what was sold in the house, and that the people selling drugs there were working together as part of a drug trafficking network.

The "certain persons" weapons conviction was likewise adequately supported by the proofs. Savage testified that a gun at the Franklin Street premises "was available in case anybody needed it." Thompson, moreover, testified that he had seen a gun on and in the pool table in the house and on a worker. In addition, Savage testified she looked for the gun after Vega's and Humphrey's murders because she "wanted to hide [the gun] for [defendant]." (emphasis added).

Although no gun was recovered by police and he was not seen by a State's witness carrying one, there is sufficient evidence of defendant's constructive possession of a gun, as a person who was in charge of the drug house. See N.J.S.A. 2C:2-1(c) (defining possession under the Criminal Code); State v. Schmidt, 110 N.J. 258, 270-71 (1988) (explaining the concept of constructive possession to encompass a person's capacity, by direct or indirect means, to gain almost immediate physical control and an ability to affect the item). Viewing the record, as we must, in a light most favorable to the State, we conclude the trial court did not err in denying defendant's motion for acquittal on the "certain persons" count.

B.

We now turn to the sentencing points. Through his counsel, defendant argues the two conspiracy counts relating to the respective murders of Humphrey and Vega had to merge. The trial judge at sentencing found no such merger was required "because they involve different victims." We respectfully disagree with that reasoning.

In essence, the State's theory at trial was that defendant conspired to murder Humphrey and Vega because they were selling their own drugs for the drug house. The conspiracy-to-murder had a manifestly common objective: to kill both Humphrey and Vega because they were each attempting to divert proceeds from defendant's operation. The two victims were apparently killed on the same night and their bodies were disposed of in the same location.

The "totality of circumstances" reflects a single conspiracy to murder the two men who had betrayed the drug operation. State v. Kamienski, 254 N.J. Super. 75, 114-15 (App. Div. 1992) (applying a "totality of circumstances" analysis to determine if multiple conspiracies or a single conspiracy existed).

The matter is remanded for correction of the judgment of conviction to merge the two conspiracy counts.[1]

We are unpersuaded, however, that defendant's conviction on the "certain persons" count, N.J.S.A. 2C:39-7(b)(1), must merge with his conviction under N.J.S.A. 2C:39-5(b) and (j) of the unlawful possession of a firearm by a person previously convicted of an offense subject to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.

Defendant's prior convictions included a "school zone" drug offense, in violation of N.J.S.A. 2C:35-7, and a conviction for aggravated manslaughter, in violation of N.J.S.A. 2C:11-4(a). Both of these crimes are eligible to qualify defendant as predicate offenses for the "certain persons" weapons conviction pursuant to N.J.S.A. 2C:39-7(b)(1). However, only the aggravated manslaughter conviction is a crime "subject to NERA" under N.J.S.A. 2C:39-5(j). Therefore, only that specific predicate crime formed a basis for the first-degree unlawful weapons possession. N.J.S.A. 2C:43-7.2(d)(2). Thus, since defendant has an independent conviction for distribution of a controlled dangerous substance near a school property, which by itself can support the

---

[1] The practical effect of such a merger is limited, since the sentences imposed on these two counts appear to have been imposed concurrently, not consecutively, with one another.

17

"certain persons" offense, the two convictions should not have merged for sentencing.

Lastly, we are not persuaded the trial court incorrectly or unfairly imposed the extended term on defendant for his offense as the leader of a narcotics trafficking network. The effect of this extended term increased his parole ineligibility period on that count from twenty-five years to thirty-five years. See N.J.S.A. 2C:35-3 and N.J.S.A. 2C:43-7(c). Although the prosecutor filed her motion for the extended term a few weeks beyond the fourteen-day deadline provided by Rule 3:21-4(e), the State indisputably established the statutory requirements for a mandatory extended term under N.J.S.A. 2C:43-7(c). Defendant had ample fair notice of the prosecutor's request before sentencing, and sufficient time to respond. We discern no basis to set this aspect of the sentence aside.

## III.

Affirmed as to defendant's convictions. Affirmed as to his sentence, except the matter is remanded for the limited purpose to revise the judgment of conviction to merge the conspiracy-to-murder offenses in counts three and four.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4779-16T3