# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3802-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GREGORY R. MAHLEY,

    Defendant-Appellant.

_____

Submitted October 16, 2025 – Decided February 6, 2026

Before Judges Paganelli and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-06-1714.

Robert N. Agre, attorney for appellant.

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Rachel M. Lamb, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

    Defendant Gregory R. Mahley appeals from trial court orders of: (1) December 15, 2021, denying his motion to dismiss certain counts of the

indictment; (2) June 21, 2022, denying his motion to suppress statements he gave after being advised of his Miranda[1] rights; (3) June 30, 2023, granting the State's motion to bar his defense expert witness; and (4) June 28, 2024, regarding his sentence. Applying well-established legal principles, we affirm.

We glean the facts and the procedural history from the record.

Grand Jury

On June 23, 2021, Detective Briana Hagan, from the Major Crimes Unit of the Camden County Prosecutor's Office, testified before a Camden County grand jury. Detective Hagan explained that she became involved in an ongoing investigation concerning defendant, an HVAC technician working at a middle school in Gloucester County. She assisted Detective Brian Farrell of the Gloucester Township Police Department (GTPD) with the investigation.

The GTPD was contacted by the school's principal with concerns regarding a "peeping Tom." Detective Farrell had spoken to the school's head custodian who advised him that defendant was "caught" in a locked exhaust room in a utility closet adjacent to the eighth-grade girls' bathroom. The exhaust room ran parallel to the girls' bathroom. The custodian thought defendant was

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

looking in on middle school girls through a vent, accessible from the closet, into the bathroom.

The custodian advised there were mirrors installed "inside of the stalls" of the bathroom. The custodian further advised that no mirrors had ever been installed there before and there was no work order for their installation. The mirrors faced the person using the toilet. Detective Farrell learned there was a vent on the wall above the toilets. Detective Hagan viewed body worn camera (BWC) footage of the stall and noted, "based on the placement of the mirror and the vent," someone could look through the vent and see the reflection of the person using the toilet. Further, there was a pipe that someone could stand on to view through one of the vents into the bathroom stall. Detective Farrell observed a boot print on the pipe.

Detective Hagan explained that GTPD Officer Thomas Messick reviewed surveillance video footage from September 4, 8, and 9, 2020, depicting defendant entering the girls' bathroom and the adjacent closet. The custodian advised there was no HVAC work order related to the bathroom and no reason for defendant to be in the adjacent closet. Defendant was found in the exhaust room on September 9.

A-3802-23

Defendant was detained and taken to the GTPD for questioning. According to Detective Hagan, defendant was "read his full Miranda rights, agreed to waive them, and g[a]ve a statement to Detective Farrell."

Defendant initially denied installing the mirrors and stated he was inside the closet on September 9, 2020 to get away from people. Detective Farrell observed defendant's boots and matched them to the boot mark on the pipe. According to Detective Hagan, defendant gave Detective Farrell consent to search his cell phone. A review of defendant's search history revealed certain websites. After being confronted with this search history, defendant admitted to installing the mirrors and stated he had hoped to view someone using the stalls but denied he ever viewed any student or teacher using them.

According to Detective Hagan, defendant also consented to a search of his work van. Defendant was transported back to the school, where police searched the van and seized two Samsung tablets. Defendant was transported back to the GTPD. Detective Hagan stated defendant was again read his Miranda rights, again waived his rights and continued to speak with Detective Farrell. Defendant admitted that one of the tablets would have videos depicting females using the bathroom in the school. According to Detective Hagan, defendant consented to Detective Farrell's search of one of the tablets that revealed a video

A-3802-23

of a juvenile female using the bathroom and, when she pulled up her pants and underwear, her vagina was seen on the video.

Detective Hagan testified that defendant further consented to the search of his home and computer equipment. Defendant was transported to his home. Two laptop computers and two cell phones were seized from the home.

Defendant's Samsung tablets, cell phones and laptop computers were submitted for forensic examination. The examination of the Samsung tablet revealed videos of girls using the bathroom during the same times defendant was seen on surveillance entering the girls' bathroom and the adjacent closet to the girls' bathroom. The videos were taken from the vantage point of the vent and revealed the girls' images in the mirror. The videos included a teacher and eighth grade girls between the ages of twelve and thirteen years old.

In addition, the forensic examination of one of defendant's laptop computers revealed over 3,000 videos, many of which included females using public restrooms. One video was date stamped in April 2014 and revealed a female wearing a shirt from a town in Cape May County. A search of defendant's employment records, from that time, disclosed he worked in a high school in the county. A search of the videos revealed that twenty of them depicted people in a bathroom stall at a high school in Cape May County. The

5

videos were taken on October 15, 2013, March 20, 2014, and April 22, 2014. Those videos were taken from the same vantage point as the middle school videos. The females depicted were sixteen and seventeen years old. In each video, the girls' vaginas were exposed.

In addition, the forensic examination of the laptop computer revealed fifteen videos from a high school in Gloucester County. Defendant had access to the high school during the time the videos were taken. The videos were taken on September 20, 2013. The videos depicted two females using the toilet from the same vantage point as the middle school videos. The females were between the ages of fourteen and sixteen years old.

After defendant's arrest, the authorities were contacted by a high school in West Deptford. The authorities were advised that mirrors were found in the girls' bathroom and a vent was located above the toilet. Further, there was a utility closet located adjacent to the bathroom. From defendant's laptop computer, the detectives matched a video from September 4, 2013, to the bathroom that depicted a seventeen-year-old female.

In addition, the detectives used an alternative light source and found stains on the wall at the West Deptford high school. The stains were swabbed and submitted to the New Jersey State Police DNA Laboratory. Defendant had been

6

swabbed during the police investigation. The laboratory reported defendant was the source of the DNA taken from the wall. The swab revealed "skin cells" and "sperm fractions."

On June 30, 2021, a Camden County grand jury filed a thirty-eight-count indictment. For conduct alleged to have occurred on September 9, 2020, the indictment listed charges for: (i) second-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(4), counts one through eight; (ii) third-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(5)(b)(iii), count nine; and (iii) third-degree invasion of privacy, N.J.S.A. 2C:l4-9(b)(1), counts ten through eighteen. For conduct alleged to have occurred on October 15, 2013, the indictment listed charges for: (i) second-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(4), counts nineteen through twenty-six and (ii) third-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(5)(b)(iii), count twenty-seven. For conduct alleged to have occurred on March 20, 2014, the indictment listed charges for: (i) second-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(4), counts twenty-eight through thirty and (ii) third-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(5)(b)(iii), count thirty-one. For conduct alleged to have occurred on April 22, 2014, the indictment listed charges for: (i) second-degree endangering the welfare of

7

children, N.J.S.A. 2C:24-4(b)(4), count thirty-two and (ii) third-degree violation endangering the welfare of children, N.J.S.A. 2C:24-4(b)(5)(b)(iii), count thirty-three. For conduct alleged to have occurred on September 20, 2013, the indictment listed charges for: (i) second-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(4), counts thirty-four through thirty-five and (ii) third-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(5)(b)(iii), count thirty-six. For conduct alleged to have occurred on June 4, 2013, the indictment listed charges for: (i) second-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(4), count thirty-seven and (ii) third-degree endangering the welfare of children, N.J.S.A. 2C:24-4(b)(5)(b)(iii), count thirty-eight.

Defendant's Motion to Dismiss Counts of the Indictment

Defendant moved to dismiss counts one through nine and nineteen through thirty-eight. Defendant argued there was insufficient evidence to establish he committed acts that would constitute endangering the welfare of a child. He contended, "with respect to debauching the morals of a minor, . . . the actual morals of a minor have to be debauched in some manner." Therefore, because the minors were not aware they were being filmed or of defendant's presence,

8

and he did not ask for affirmative acts or have contact with them, their morals were not debauched.

On December 15, 2021, after hearing the parties' arguments, the trial court denied the motion in an oral opinion. The court concluded, after careful review of the statute and the model jury charge, there was no requirement for the minor's morals to have been debauched under N.J.S.A. 2C:24-4(b). Further, the court concluded the State presented a prima facie case to the grand jury relying on the DNA match, the websites found in defendant's search history, and the videos of girls using the bathroom.

Miranda

Defendant moved to suppress statements he made to the police while in custody. On June 21, 2022, the trial court held a N.J.R.E. 104 hearing. Detective Farrell was the only witness called. He testified that on September 9, 2020, he responded to the middle school "for a suspicious act" involving mirrors in the girls' bathroom and "they felt there might have been someone peering at the students." Detective Farrell investigated the bathroom stalls and the janitor's closet, and service closet therein, that abutted the girls' bathroom. He observed vents that provided visual access to the bathroom and a mirror in the stall. Detective Farrell also observed a boot print on a pipe in the janitor's closet. He

was advised by Officer Messick that there was video surveillance of defendant entering the girls' bathroom and janitor's closet in the days before September 9. On September 6 and 9, the video captured defendant entering the janitor's closet and staying there for long periods of time.

Detective Farrell stated he met with defendant at the middle school. He advised defendant they "were investigating mirrors being hung in the girls[1]. bathroom." Defendant denied knowing anything about the mirrors. Their interaction was captured on Officer Messick's BWC and played for the trial court.

Detective Farrell spoke with the head custodian who informed him that there were no work orders regarding the installation of mirrors in the girls' bathroom. Further, the detective determined there was no reason for defendant to have been in the bathroom or in the closets.

Detective Farrell proceeded to the GTPD to interview defendant. Their entire interaction was video and audio recorded and played for the trial court. The detective stated before reading defendant his Miranda rights, that he told him "you're not under arrest, . . . you're just being detained" and "[y]ou don't have any charges against you or anything right now." Detective Farrell told defendant he wanted to get him help if he had a problem. The detective believed

defendant understood his <u>Miranda</u> rights and, in fact, defendant circled the answers on the <u>Miranda</u> form himself. Further, defendant indicated he would give a statement "because he had nothing to hide."

In addition, Detective Farrell stated defendant had two Samsung Galaxy phones. The detective explained to defendant he had the right to refuse the request to search the phones. Defendant signed the consent to search form.

Thereafter, Detective Farrell and defendant returned to the middle school. Again, their interactions were captured on Officer Messick's BWC and played for the trial court. The parties went to the location of defendant's work van parked in the school parking lot. Detective Farrell presented consent forms to search defendant's van and defendant signed the forms. The detective testified that he removed two tablets from defendant's van.

Once again, defendant was transported back to the police department for further interview. Detective Farrell advised defendant "I don't have any charges on you right now or anything." The interview was video and audio recorded and played for the trial court. Detective Farrell testified he offered defendant to use the restroom and a drink, but defendant refused. Later defendant did accept a glass of water. Defendant executed the consent form to search the tablets.

Detective Farrell testified he saw "a couple of videos, and they were of various lengths, and [he] could see the vantage point from inside that service hallway from the vent into the girls['] bathroom stall with the mirrors." He stated he recognized the vantage point from his earlier investigation. He also stated he saw a young lady go into the stall.

Thereafter, defendant was transported to his residence. Defendant had been read his rights to refuse the search of the residence and had signed a consent form to search. Defendant allowed Detective Farrell into the residence and advised him about his laptop. The detective seized the laptops and contacted the assistant prosecutor to advise as to appropriate criminal charges.

To support his motion to suppress, defendant argued the State had a "circumstantial case" that he "had planted mirrors into a stall in a girls['] bathroom at the . . . [m]iddle [s]chool." Defendant was not certain "[w]hether or not Detective Farrell could have gotten charges based on that circumstantial evidence."

Defendant contended Detective Farrell "wanted to develop better proofs" and "capitalize[d] on . . . defendant's vulnerability in order to achieve that objective." Defendant noted he was told twice before the first <u>Miranda</u> warning that he "wasn't under arrest or hadn't been charged" perhaps making him "feel

more comfortable" and "freer to speak." Further, Detective Farrell assured him, he wanted to see him "get help." Defendant stated "[b]y the end of the first statement, [he] had confessed to hanging a mirror and viewing" and Detective Farrell was aware of the internet history and his "interest in watching people go to the bathroom." At this point, defendant contended there was enough information to charge him. Moreover, after the second statement, Detective Farrell received even more information. Defendant argued "trickery was used to obtain a statement . . . that he would not have given had he known that charges were pending against him."

On June 21, 2022, after hearing the parties' arguments, the trial court denied defendant's motion to suppress. In an oral opinion, the court found Detective Farrell's testimony to be "very professional" and "[h]e made good eye contact." It found the detective was "knowledgeable," his answers were "reasonable," and "[h]e provided good recall of the events." The trial court noted Detective Farrell "wanted to be particularly accurate," adding to his "credibility" and "inherent" believability.

Regarding Detective Farrell's interaction with the defendant during the investigation, the trial court found the detective's demeanor "very calm" and that of a "friendly type person." It found the detective "never raise[d] his voice" and

"no evidence of intimidating, badgering, threatening, mental exhaustion, [or] punishment of any kind, whatsoever."

The court noted defendant was offered a "glass of water" and the use of a restroom. Further, the court noted the officers adhered to defendant's "wishes" regarding proceeding and he was advised he was not going to have to do anything he did not want to do. The trial court found Detective Farrell did nothing "incorrect by continuing in his practice of advising individuals . . . there were no charges" and found no evidence of "deception or trickery." The court stated defendant was treated with "overall sensitivity and kindness."

Defense Expert

The State moved to bar the opinion of Frank Dattilio, Ph.D., defendant's proposed expert witness. The trial court heard the parties' arguments on April 5, 2023. The State contended Dr. Dattilio's opinion that "defendant suffers from paraphilia, not pedophilia" was not "relevant in this case" because the State did not have to present evidence as to defendant's state of mind when he engaged in the conduct.

Defendant argued that the expert would assist the jury by explaining he "does not have [a] pedophilic arousal pattern." In other words, he "does not get aroused by viewing" minors. Instead, the expert would opine defendant was

A-3802-23

"arous[ed] from observing unsuspecting females compromised in a female's restroom" and "viewing females over the age of 18 . . . in general surreptitiously."

On June 1, 2023, the trial court held a N.J.R.E. 104 hearing. Dr. Dattilio was the only witness to testify. The court admitted Dr. Dattilio "as an expert in the psychological evaluation of sex offenders and the components of that evaluation of sex offenders." At the conclusion of the hearing, the court permitted the parties to file post-hearing submittals.

The matter returned to court on June 30, 2023. In granting the State's motion, the trial court issued an oral opinion. The court found Dr. Dattilio's testimony credible, stating he "remained calm and professional throughout the hearing. He answered the questions directly and in a reasonable manner, both on direct and cross. He was not evasive, he conceded points on cross at times, [and] admitted his own oversights in his report."

The trial court, in detail, reviewed Dr. Dattilio's testimony. The court noted the doctor had interviewed the defendant's wife, "took a history of . . . defendant's life through clinical interview, . . . reviewed records from the litigation[,] and . . . completed an assessment."

A-3802-23

The court noted "[o]n direct, the [d]octor testified that . . . defendant was more interested in adult females, those above [eighteen], and the [d]octor said he reached that conclusion from the interview of the defendant and from interviewing the wife and the actuarial test given." However, "[o]n cross, when the [d]octor was specifically asked '[w]hat actuarial test evaluated whether . . . defendant is sexually aroused by adult females as opposed to female minors,' the [d]octor very clearly and without hesitation answered, '[n]one of them.'" The trial court found "the [d]octor conceded that the actuarial test that he had conducted had nothing to do with determining whether or not the defendant was sexually aroused by adult females versus minor females."

Further, "[t]he [d]octor made clear that the defendant's arousal [wa]s in capturing females surreptitiously, . . . the [d]octor explained that . . . the key part is that it is females using the bathroom, regardless of age, when they are surreptitiously viewed by the defendant. That is what cause[d] his sexual arousal."

Moreover, the court noted

> the [d]octor agreed that while he had indicated in his reports that the defendant's wife had indicated to him that there had never been a time in which defendant's behavior would support that defendant had sexual interests in children, . . . the wife had actually stated

16

A-3802-23

otherwise to law enforcement when they had initially arrived at the house with . . . defendant.

In addition, the court stated "defendant had told him there was more of an arousal from the adult females, and that [wa]s essentially why the [d]octor had placed in his report that the defendant was aroused by women." However, "at the hearing, the [d]octor stated that the defendant was aroused by any female using the toilet." Further, "[i]t was the surreptitious nature of the event that aroused the defendant," but "this came from . . . defendant[']s own statements and not from any of the tests and this [wa]s not a scientific reliable basis."

The trial court indicated it must determine if the doctor's testimony was relevant under N.J.R.E. 401 and whether its "probative value [was] substantially outweighed by a risk of confusion or misleading the jury" under N.J.R.E. 403. The court determined the doctor's opinion regarding defendant's paraphilia diagnosis did "not matter to the facts that the jury must determine." Further, the court found the diagnosis would "could confuse the jury." Therefore, the court barred Dr. Dattilio's opinion "as it [wa]s not relevant and any probative value [wa]s substantially outweighed by the risk of confusing or misleading the jury."

Moreover, the trial court found "even if Dr. Dattilio's opinion w[as] relevant under Rule 401, [it] would bar it," because it did "not meet the Daubert[2] standard and [N.J.R.E.] . . . 702." The court noted a shift in defendant's argument as a result of the "[d]octor's opinion that defendant's sexual arousal pattern did not include or was not focused on the minors but rather women." As the judge explained, the doctor now opined defendant was aroused by "seeing females of any age, so long as it's done surreptitiously and while they're using the toilet." The court stated if that opinion was relevant, it was required to consider whether it "satisfie[d] the Daubert standard as articulated in State v. Olenowski [(Olenowski I)], 253 N.J. 133 (2023) . . . and Rule . . . 702." (Citation reformatted).

The court found the doctor's opinion was not supported by "any actuarial test." Further, that the doctor did not use "scientific tests . . . to reach [his] conclusions and his opinion." Instead, the court stated the doctor "relied on defendant's clinical interviews which were essentially the defendant's self-serving statements, the interview of defendant's wife which the [d]octor later admitted was contradictory to the investigative discovery and . . . the [d]octor's general professional experience." The court concluded "the [d]octor's opinion

---

[2] Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579 (1993).

18                                                              A-3802-23

with respect to the defendant only being sexually aroused by adult females and not minor females [wa]s no[] longer supported by [his] own testimony." Moreover, the court found "the [d]octor's opinion that the defendant [wa]s not sexually aroused by the partial nudity of the females but rather by the fact that he . . . surreptitiously watch[ed] them use the toilet, . . . [wa]s not supported by any scientific theory or technique."

In addition, the court found the doctor's "report and opinion . . . ha[d] not been the subject of peer review or based upon publications." There was "also, . . . no evidence of any potential rate of error since again, there was no particular scientific technique used to reach that decision, and no evidence of general acceptance in the relevant scientific community."

The trial court concluded Dr. Dattilio's opinion did "not meet any of the Daubert factors as . . . stated in Olenowski [I] or in Rule . . . 702," and because it was not "based on any scientific theory or reliable foundation or any of the Daubert factors," it granted the State's motion to bar the defense expert's opinion.

Plea/Sentence

On August 25, 2023, defendant entered a guilty plea. He pleaded guilty to count one of the indictment, second-degree manufacturing of child

19

pornography which was amended to include all the victims from the Gloucester Township middle school. The plea agreement provided for defendant to receive a seven-year sentence with three-and-a-half years to be served without the possibilty of parole. In addition, defendant acknowledged the State would move for the imposition of parole supervision for life. N.J.S.A. 2C:43-6.4. The plea subjected defendant to the requirements of Megan's Law, N.J.S.A. 2C:7-2(b); submit a DNA sample; an Avenel psychological evaluation, N.J.S.A. 2C:47-1; and fines and penalties.

Also, defendant pleaded guilty to count nineteen of the indictment, second-degree manufacturing of child pornography which was to be amended to include all the victims from the Cape May and Clearview high schools. The plea agreement provided for defendant to receive a seven-year sentence with three-and-a-half years to be served without the possibilty of parole to run consecutive to count one but concurrent with counts eighteen and thiry-three. In addition, defendant acknowledged the State would move for the imposition of parole supervision for life. The plea subjected defendant to the requirements of Megan's Law; submit a DNA sample; an Avenel evaluation; and fines and penalties.

Moreover, defendant pleaded guilty to count eighteen, third-degree invasion of privacy as to the sole adult victim. Defendant was to receive a three-year sentence to run concurrent to all other counts. Lastly, defendant pleaded guilty to count thirty-three, third-degree possession of 1,000 images depicting sexual exploitation of a minor which included the victims from the middle school and high schools. Defendant was to receive a three-year sentence to run concurrent to all other counts.

On June 28, 2024, the matter returned to court for sentencing. The trial court stated it reviewed the presentence report. The court also considered the adult victim's statement and the statutory aggravating and mitigating factors. See N.J.S.A. 2C:44-1 (setting forth the mitigating and aggravating factors a court must consider in determining an appropriate sentence).

In terms of aggravating factors, the court found aggravating factor three, "risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3); because there was a risk defendant would commit another similar crime. The court found defendant's conduct was committed over many years and it was "not a one-time abberrant course of behavior at one school." Instead, the court found defendant "had a gap of years . . . in which it d[id] not appear that he engaged in this type of behavior and then all of the sudden" he resumed his behavior.

21

Moreover, the court noted that "while the Avenel report d[id] not find . . . defendant [wa]s compulsive, [it] d[id] find that he [wa]s repetitive." In addition, there was no evidence of "any extensive therapy undertaken at any point by . . . defendant." The court gave this factor "great weight."

Also, the trial court found aggravating factor nine, "need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9). The court noted defendant acknowledged the need to deter and the State's argument that this factor was present. The court placed "great weight" on this factor stating there were "public safety reasons and the safety of vulnerable minors in the community."

As to mitigating factors, the trial court did not find mitigating factor one, "defendant's conduct neither caused nor threatened serious harm," N.J.S.A. 2C:44-1(b)(1). The court stated it "listened carefully to the victim statement" and noted the victim had "been in therapy" and was harmed. Further, defendant's conduct "threaten[ed] serious harm, psychological and emotional harm to the[] victims."

The trial court also did not find mitigating factor two, "defendant did not contemplate that the defendant's conduct would cause or threaten serious harm," N.J.S.A. 2C:44-1(b)(2); because "[i]t c[ould ]not be said that the defendant

22

could not have contemplated the threat and serious harm to these minor victims and the adult victim as a result of his actions once discovered." Further, the court explained there "was always a risk" of harm. In addition, the court found "[d]efendant had to have realized that the invasion of privacy that he recorded and stored on his electronic devices could cause these victims harm."

The court considered mitigating factors three, "defendant acted under a strong provocation," N.J.S.A. 2C:44-1(b)(3); four, "[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense," N.J.S.A. 2C:44-1(b)(4); five, "[t]he victim of the defendant's conduct induced or facilitated its commission," N.J.S.A. 2C:44-1(b)(5); and six, "defendant has compensated or will compensate the victim of the defendant's conduct for the damage or injury that the victim sustained, or will participate in a program of community service," N.J.S.A. 2C:44-1(b)(6); and found they were not present despite defense counsel's argument that defendant "suffer[ed] from a fetish, a psychological condition." The court stated it did not find, "under the law and the statute" that these factors would be applicable.

The sentencing court found mitigating factor seven, "defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for

23

a substantial period of time before the commission of the present offense," N.J.S.A. 2C:44-1(b)(7). It noted the State agreed this factor applied because defendant had "no prior indictable convictions nor disorderly persons" offenses. The court gave this factor "some weight."

The sentencing court did not find mitigating factor eight, "defendant's conduct was the result of circumstances unlikely to recur," N.J.S.A. 2C:44-1(b)(8). The court considered defendant would have to register under Megan's Law, but found that registration did "not mean that the defendant w[ould] not be able to secretly record minors and adults using the bathroom in the future." The court also stated "there was a significant period of time between the first series of tapings . . . and . . . the subsequent more recent ones." Given defendant's history, the court found "his conduct could recur."

The trial court did not find mitigating factor nine, "character and attitude of the defendant indicate that the defendant is unlikely to commit another offense," N.J.S.A. 2C:44-1(b)(9). The court recalled defendant's "initial complete denials." Further, the court stated it was "not aware of any treatment of defendant while incarcerated or beforehand."

The court agreed with the parties that mitigating factors ten, N.J.S.A. 2C:44-1(b)(10) "defendant is particularly likely to respond affirmatively to

24

probationary treatment"; and eleven, N.J.S.A. 2C:44-1(b)(11), "imprisonment of the defendant would entail excessive hardship to the defendant or the defendant's dependents," were not applicable.

The sentencing court found mitigating factor twelve, "willingness of the defendant to cooperate with law enforcement authorities," N.J.S.A. 2C:44-1(b)(12). The court noted "the parties agree[d] that this factor [wa]s applicable as defendant spoke with law enforcement and eventually did make a number of admissions and also consented to a search of his vehicle and multiple electronic devices." The court found the factor was applicable and gave it "some weight."

The sentencing court found mitigating factor thirteen, N.J.S.A. 2C:44-1(b)(13) "conduct of a youthful defendant was substantially influenced by another person more mature than the defendant"; and fourteen, N.J.S.A. 2C:44-1(b)(14) "defendant was under 26 years of age at the time of the commission of the offense," were not applicable.

The sentencing court stated that "in weighing those aggravating factors found by the [c]ourt, and the mitigating factors found by the [c]ourt on a qualitative as well as quantitative basis, the . . . aggravating factors outweigh the mitigating factors." The court noted the parties had a "negotiated plea agreement." The court found "the plea agreement [wa]s fair and in the interest

25

of justice" and therefore, "sentence[d] defendant . . . in accordance with the plea agreement."

Defendant presents the following arguments on appeal:

> I. THE TRIAL COURT ERRED IN FAILING TO DISMISS COUNTS 1-9 AND COUNTS 19-38 OF THE INDICTMENT.
>
> II. THE TRIAL COURT ERRED IN DENYING [DEFENDANT]'S MOTION TO SUPPRESS STATEMENTS MADE TO LAW ENFORCEMENT.
>
> III. THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO BAR[] THE TESTIMONY, OPINIONS, A[N]D REPORTS OF [DEFENDANT]'S EXPERT WITNESS DR. FRANK DATTILIO.
>
> IV. THE TRIAL COURT ERRED AS TO AGGRAVAT[ING] FACTOR THREE AND MITIGATING FACTO[R]S TWO AND NINE AND THUS ERRED IN [ITS] IMPOSITION OF A PERIOD OF PAROLE INELIGIBLITY.

We consider each of these arguments in turn.

I.

Defendant raises two arguments regarding the trial court's denial of his motion to dismiss counts one through nine and counts nineteen of the indicment. First, he argues under N.J.S.A. 2C:24-4(b)(4) and N.J.S.A. 2C:24-4(b)(5)(b)(iii), "there must be some evidence of the sexual nature of the item or

content as it pertains specifically to the child, and that the nudity of the child would debauch that child's morals." He contends he was "not accused of having any contact with the females that were involved, and they had no knowledge of what was occurring." Nor, he argues, was there an allegation "that he approached them, spoke with them, or that they were even aware of his presence." Therefore, "[i]t is too great of a stretch to conclude that the morals of the individuals who were allegedly spied on while performing, albeit a private, but mundane activity could have been impaired or debauched."

Second, as to counts one through nine, defendant contends "the State failed to present any testimony that the intimate parts of minor victims[] named . . . could be seen on the recordings seized." Defendant asserts "[t]he State only put forth testimony that one recording from September 9, 2020 . . . showed a minor's intimate part, and that [person] was not identified." Therefore, according to defendant, "[a]bsent this key detail, the grand jury heard no evidence that the videos depicting females on [that date] . . . depicted a prohibited sexual act of a minor or simulation of such, as required under both N.J.S.A. 2C:24-4(b)(4) and N.J.S.A. 2C:24-4(b)(5)(b)(iii)." Defendant argues this missing evidence rendered the indictment "manifestly deficient and palbably defective."

"One of the guiding principles to be followed by a court when considering a motion to dismiss an indictment is that 'a dismissal of an indictment is a draconian remedy . . . .'" State v. Zembreski, 445 N.J. Super. 412, 424-25 (App. Div. 2016) (quoting State v. Williams, 441 N.J. Super. 266, 271 (App. Div. 2015)). "An indictment is presumed valid." State v. Feliciano, 224 N.J. 351, 380 (2016).

"We review a trial court's decision on a motion to dismiss an indictment for abuse of discretion." State v. Nieves, 476 N.J. Super. 609, 654 (App. Div. 2023) (citing State v. Bell, 241 N.J. 552, 561 (2020)). Thus, a "trial court's 'decision [will] be reversed on appeal only [if] it clearly appears that the exercise of discretion was mistaken[.]'" Bell, 241 N.J. at 561 (second alteration in original) (quoting State v. Abbati, 99 N.J. 418, 436 (1985)). "[O]ur review of a trial judge's legal interpretations is de novo." State v. Eldakroury, 439 N.J. Super. 304, 309 (App. Div. 2015) (citing State v. Grate, 220 N.J. 317, 329-30 (2015)).

A trial "court should dismiss [an] indictment 'only on the clearest and plainest ground, and only when the indictment is manifestly deficient or palpably defective.'" Bell, 241 N.J. at 560 (quoting State v. Twiggs, 233 N.J. 513, 531-32 (2018)). An indictment is palpably defective when there is an

"absence of any evidence to support the charges." Nieves, 476 N.J. Super. at 654 (quoting State v. Morrison, 188 N.J. 2, 12 (2006)). A trial court must "determine[] 'whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it.'" State v. Saavedra, 222 N.J. 39, 56-57 (2015) (quoting Morrison, 188 N.J. at 13). The "court 'should not disturb an indictment if there is some evidence establishing each element of the crime to make out a prima facie case.'" Id. at 57 (quoting Morrison, 188 N.J. at 12).

Applying this well-established law, we conclude neither of defendant's arguments have merit. Under N.J.S.A. 2C:24-4(b)(4):

> A person commits a crime of the second degree if the person photographs or films a child in a prohibited sexual act or in the simulation of such an act or for portrayal in a sexually suggestive manner or who uses any device, including a computer, to reproduce or reconstruct the image of a child in a prohibited sexual act or in the simulation of such an act or for portrayal in a sexually suggestive manner.
>
> [(Emphasis added).]

Under N.J.S.A. 2C:24-4(b)(5)(b)(iii):

> A person commits a crime of the third degree if the person knowingly possesses, knowingly views, or knowingly has under the person's control, through any

means, including the Internet, less than 1,000 <u>items depicting the sexual exploitation</u> or abuse of a child.

[(Emphasis added).]

Further, an

"[i]tem depicting the sexual exploitation or abuse of a child" or "child sexual abuse or exploitation material" or "CSAEM" means a photograph, film, video, an electronic, electromagnetic, or digital recording, an image stored or maintained in a computer program or file or in a portion of a file, or any other reproduction or reconstruction which:

(a) depicts a child engaging in a <u>prohibited sexual act</u> or in the simulation of such an act; or

(b) portrays a child in a sexually suggestive manner.

[N.J.S.A. 2C:24-4(b)(1) (emphasis added).]

Under both N.J.S.A. 2C:24-4(b)(4) and N.J.S.A. 2C:24-4(b)(5)(b)(iii), a "'prohibited sexual act' means . . . [n]udity, if depicted for the purposes of sexual stimulaton or gratification of any person who may view such depiction." N.J.S.A. 2C:24-4(b)(1). Therefore, under these sections of the statute, the indictment sufficiently pled the violations because defendant's "sexual stimulation and gratification" were sufficient for the charges. Importantly, unlike N.J.S.A. 2C:24-4(a), subsection (b) does not require a defendant's

30

conduct to "impair or debauch the morals of the child" victim.  Therefore, the trial court did not abuse its discretion in denying defendant's motion to dismiss the counts of the indictment because the evidence on defendant's electronic devices and the DNA evidence were suffcient to establish a prima facie case.

Second, as to the September 9, 2020 incidents, counts one through nine, Detective Hagan testified a search of defendant's Samsung tablet revealed a video of "what appeared to be a juvenile female using the handicapped stall in th[e] bathroom . . . and when the juvenile female went to pull up her pants and her underwear, her vagina could be seen on the video."  Further, nine incidents depicting eight females were recovered and each incident was depicted from "the same vantage point"—"viewing through the vents and seeing the reflection of the female in the mirror."  The trial court was required to draw rational inferences from this evidence in the State's favor.  We conclude the trial court did not abuse its discretion on denying defendant's motion to dismiss counts one throuh nine of the indictment.  Detective Hagan's testimony sufficiently supported these counts of the indictment.

## II.

Defendant argues the trial court erred in denying his motion to suppress his statements to Detective Farrell.  He contends the detective's statement to him

31

that they were "looking into what [wa]s going [o]n with these mirrors in the girls['] bathroom" was misleading "as to the seriousness and gravity of the investigation for which he [wa]s being detained."  (Second alteration in original).  He asserts the trial court failed to consider this statement.

Further, he argues the trial court erred in considering Detective Farrell's statements that he was not charged because the court was additionally required to consider whether the detective made "efforts to hide or withhold the severity of the crimes for which [he wa]s being investigated for, as well as refraining from filing a complaint to avoid the mandatory . . . disclosures."

"Our review of a motion to suppress is limited and deferential."  State v. Bullock, 253 N.J. 512, 532 (2023).  Thus, "we defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record."  Ibid. (quoting State v. Sims, 250 N.J. 189, 210 (2022)).  That "deference recognizes the trial court's 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'"  Ibid. (quoting State v. Elders, 192 N.J. 224, 244 (2007)) (internal quotation marks omitted).  "A trial court's legal conclusions, 'however, and the consequences that flow from established facts,' are reviewed de novo."  Ibid. (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and . . . N.J.R.E. 503." Ibid. (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)).

In Miranda v. Arizona, 384 U.S. 436 (1966), "the United States Supreme Court declared that a person who is 'subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way,' 'must be adequately and effectively apprised of his rights[.]'" Bullock, 253 N.J. at 532 (internal citations omitted) (quoting Miranda, 384 U.S. at 467). "[A] confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights." Id. at 533 (quoting Hubbard, 222 N.J. at 263).

A defendant may waive their Miranda rights. A waiver of a defendant's Miranda rights may "never be the product of police coercion" but must instead be "knowing, intelligent, and voluntary in light of all of the circumstances." State v. Presha, 163 N.J. 304, 313 (2000). A waiver may "be established even absent formal or express statements." Berghuis v. Thompkins, 560 U.S. 370, 383 (2010). "An explicit statement is not necessary as '[a]ny clear manifestation

of a desire to waive is sufficient,' and instead we look for a 'showing of a knowing intent.'" State v. A.M., 237 N.J. 384, 397 (2019) (alteration in original) (citation and internal quotation marks omitted) (quoting State v. Kremens, 52 N.J. 303, 311 (1968)).

New Jersey law requires that the prosecution "prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." Presha, 163 N.J. at 313. When applying that standard, "'knowledge' is always a relevant factor," but "because the right is against compelled self-incrimination, 'knowledge' can be best understood as a condition of 'voluntariness,' which itself denotes the absence of 'compulsion.'" State v. Reed, 133 N.J. 237, 255-56 (1993) (emphasis omitted).

When "determining the validity of a Miranda waiver," trial courts must decide "whether the suspect understood that he did not have to speak, the consequences of speaking, and that he had the right to counsel before doing so if he wished." Nyhammer, 197 N.J. at 402 (quoting State v. Magee, 52 N.J. 352, 374 (1968)).

Accordingly, "a valid waiver does not require that an individual be informed of all information useful in making his decision." Id. at 407 (quoting Colorado v. Spring, 479 U.S. 564, 576 (1987)) (internal quotation marks

A-3802-23

omitted).  Instead, a knowing, intelligent, and voluntary waiver is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court.  See Presha, 163 N.J. at 313.

In the totality-of-the-circumstances inquiry, courts generally rely on factors such as "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."  State v. Miller, 76 N.J. 392, 402 (1978).  Also, "deception is an important factor to be considered as part of the totality of the circumstances in determining whether the State has met its heavy burden of proving beyond a reasonable doubt that the defendant made a knowing waiver of the right against self-incrimination."  State v. Diaz, 470 N.J. Super. 495, 527 (App. Div. 2022).

In State v. A.G.D., 178 N.J. 56, 68 (2003), the Court held "[t]he government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights."  It stated, "a criminal complaint and arrest warrant signify that a veil of suspicion is about to be draped on the person, heightening his risk of criminal liability."  Ibid.

35

Therefore, under those circumstances, "[w]ithout advising the suspect of his [or her] true status when he [or she] does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his [or her] confession's admission." Ibid.

A.G.D. "calls for law enforcement officials to make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges filed against him [or her]." State v. Vincenty, 237 N.J. 122, 134 (2019). The State may provide the information "immediately before or after administering Miranda warnings," however the "information should not be woven into accusatory questions posed during the interview." Ibid. The key is for a defendant to be "aware of the charges pending against them before they are asked to waive the right to self-incrimination." Ibid.

However, aside from an actually filed complaint-warrant or an issued arrest warrant, "[t]he officers need not speculate about additional charges that may later be brought or the potential amendment of pending charges." Sims, 250 N.J. at 214.

Applying this well-established law, we conclude there is no basis to disturb the trial court's factual findings that were adequately supported in the

record. The trial court found Detective Farrell's testimony to be credible. Moreover, it found defendant to be an intelligent adult. Further, the trial court found no threats or coercion and that defendant was treated with "overall sensitivity and kindness." The court found no "deception or trickery" or anything incorrect with Detective Farrell advising defendant there were no pending charges.

In conducting our de novo review of the law, the circumstances here do not rise to the level of A.G.D., because no "criminal complaint or arrest warrant ha[d] been filed or issued." 178 N.J. at 68. Detective Farrell was not required to "speculate" regarding what charges would be brought. See Sims, 250 N.J. at 214. In addition, we conclude Diaz is inapplicable because defendant was not tricked into waiving his Miranda rights, instead he was advised there were no charges when, in fact, there were no charges filed at that time.

Moreover, defendant was read his Miranda rights in a calm and deliberate manner, and he indicated he understood his rights. Defendant appeared to be an intelligent adult, the length of detention was not prolonged, and there was no physical punishment or mental exhaustion. See Miller, 76 N.J. at 402. We conclude the State established, beyond a reasonable doubt, defendant's knowing, voluntary, and intelligent waiver of his Miranda rights.

37

III.

Defendant argues the trial court erred in barring Dr. Dattilio's expert opinion. He contends the court's rigid approach incorrectly "held the methods [for] psychological evaluations, a 'soft' science, to [the] empirical and exacting standards of 'hard' sciences." Moreover, defendant argues the "court took great lengths to criticize the conclusions of Dr. Dattilio" and "improperly inserted" its own opinion. (Emphasis omitted).

In Olenowski I, the New Jersey Supreme Court established "the appropriate standard to evaluate the admissibility of expert evidence under N.J.R.E. 702," in criminal cases. 253 N.J. 133, 138 (2023). The Court adopted the standard announced in Daubert. The Court stated, "trial courts directly examine the reliability of expert evidence by considering all relevant factors, not just general acceptance." Olenowski I, 253 N.J. at 151. The Court noted Daubert provided a "non-exclusive" list of factors, id. at 147, that focuses on "testing, peer review, error rates, and other considerations . . . to assess the reliability of the theory or technique in question." Id. at 152. The Court stated the "Daubert factors will help guide trial courts as they perform their important role as gatekeepers." Id. at 154. In addition, "[j]udges may . . . continue to

A-3802-23

consider whether a principle is generally accepted by the scientific community." Id. at 152.

In State v. Olenowski (Olenowski II), the Court held, "in New Jersey criminal . . . cases in which the trial court has admitted or excluded an expert witness based upon Daubert reliability factors, our appellate courts shall review that reliability determination de novo."  255 N.J. 529, 580-81 (2023).

Further, we apply an "abuse of discretion" standard of review to "other case-specific determinations about the expert evidence -- such as whether the witness has sufficient expertise, whether the evidence can assist the trier of fact in that case, and whether the relevant theory or technique can properly be applied to the facts in issue." Id. at 581.  Under the abuse of discretion standard, "rulings are generally upheld 'unless the evidentiary ruling is so wide of the mark that it constitutes a clear error in judgment.'"  Id. at 572 (quoting State v. Allen, 254 N.J. 530, 543 (2023)) (internal quotation marks omitted).

Applying this well-established law, we review de novo the trial court's conclusion that Dr. Dattilio's report be barred for failing to satisfy Daubert and Rule 702.  We conclude there was no error as a matter of law.  The trial court determined the doctor's opinion was not supported by "testing, peer review, error rates, and other considerations."  See Olenowski I, 253 N.J. at 152.  Based on

our review of the record, we agree it was not. Moreover, included within the court's "other considerations," were defendant's "self-serving" statement and his wife's contradicted statement. Under these circumstances, the doctor's opinion was unreliable, and the trial court correctly fulfilled its gatekeeping role.

The trial court also barred Dr. Dattilio's opinion under N.J.R.E. 403(a), because it found "its probative value [wa]s substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury." Rule 403(a). Considering the expert opinion seemed to change during the course of the Rule 104 hearing, we conclude there was no abuse of discretion in this decision.

IV.

Defendant argues the trial court erred in imposing the sentence. He contends the court erred in finding aggravating factor three and in failing to find mitigating factors two and nine.

With respect to aggravating factor three, defendant contends "the court completely ignored the empirical[ and] psychological testing from" Avenel and Dr. Dattilio. Defendant asserts "[b]oth of these psychological experts opined that [he] was not likely to reoffend." Moreover, defendant argues the trial court's reliance on "the absence of therapy" "shocks the judicial conscious and clearly

d[id] not meet the . . . standard of credible evidence." Indeed, defendant notes he "is very eager to commence treatment and wants to change his behaviors."

In addition, defendant contends the trial court erred in not finding mitigating factor two, N.J.S.A. 2C:44-1(b)(2). He argues the trial court engaged in "pure speculation" because it failed to point to evidence in the record, and its "assumption . . . f[e]ll[] woefully short of . . . competent, credible evidence." (Emphasis omitted).

Defendant also argues the trial court erred in not finding mitigating factor nine, N.J.S.A. 2C:44-1(b)(9), "[t]he character and attitude of the defendant indicate that the defendant is unlikely to commit another offense." Defendant contends the court "disregarded [his] repeated remorse for his actions, his willingness to commence treatment, and the empirical evidence from two mental health evaluations."

Appellate "review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). The sentencing court's "discretion in that area is bounded by the law and court rules." Ibid. (quoting State v. Tedesco, 214 N.J. 177, 189 (2013)). Therefore we

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating

factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

We do "not substitute [our] judgment for that of the sentencing court." Ibid.

"A sentence imposed pursuant to a plea agreement is presumed to be reasonable because a defendant voluntarily '[waived] . . . his [or her] right to a trial in return for the reduction or dismissal of certain charges, recommendations as to sentence and the like.'" Id. at 70-71 (first alteration in original) (quoting State v. Davis, 175 N.J. Super. 130, 140 (App. Div. 1980)).

Applying these well-established principles, we conclude the trial court did not abuse its disretion in sentencing defendant. We start with the presumption of reasonableness attached to the plea agreement. See Fuentes, 217 N.J. at 70-71.

As to mitigating factor two, the sentencing court found defendant had to have recognized the "threat and serious harm" once his actions were discovered. Moreover, it noted there "was always a risk" to the victims. These findings are supported by competent and credible evidence and were not, as defendant

suggests, founded on the court's "speculation." In addition, the court found mitigating factor nine was not present because defendant's "character and attitude" indicated he was "[]likely to commit another crime or offense" because of his "initial complete denials" and the lack of treatment. Again, these findings were based on competent and credible evidence in the record.

The court found that aggravating factor three was present because there was a risk defendant would commit another offense. The trial court found: defendant's conduct spanned many years and included a gap of years; the Avenel report opined defendant was "repetitive"; and defendant had not undergone therapy. These findings were sufficiently supported by reliable evidence in the record.

There is nothing in the record to suggest "the sentence [is] clearly unreasonable so as to shock the judicial conscience." Ibid. (quoting Roth, 95 N.J. at 364-65).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3802-23